**UNITED STATES of America, Plaintiff–Appellee,**

v.

**John Jay HILL and Malcolm Scott Hill, Defendants–Appellants.**

**No. 98–6047.**

United States Court of Appeals, Sixth Circuit.

Argued Aug. 11, 1999.

Decided Oct. 4, 1999.

Paul M. O'Brien (argued and briefed), Asst. U.S. Attorney, Memphis, TN, for Plaintiff–Appellee.

W. Thomas Dillard (briefed), Richard L. Gaines (argued), Ritchie, Fels & Dillard, Knoxville, TN, for Defendants–Appellants.

Before: KRUPANSKY, BOGGS, and CLAY, Circuit Judges.

CLAY, J., delivered the opinion of the court, in which KRUPANSKY, J., joined. BOGGS, J., concurred in the result only.

## OPINION

CLAY, Circuit Judge.

Defendants, John J. Hill and Malcolm Scott Hill, appeal from the judgment of conviction entered by the United States District Court for the Western District of Tennessee, following Defendants' conditional guilty plea to one count of possession with intent to distribute cocaine, in violation of 18 U.S.C. § 841(a)(1), wherein Defendants reserved the right under Federal Rule of Criminal Procedure 11(a)(2) to appeal the district court's order denying their motion to suppress the evidence seized from Defendants' U–Haul Rental Truck on February 23, 1996, pursuant to a traffic stop. For the reasons set forth below, the district court's order denying Defendants' motion to suppress is AFFIRMED.

## BACKGROUND

On the evening of February 23, 1996, Deputy Steve Whitlock of the Shelby County, Tennessee, Sheriff's Department Interstate Interdiction Unit was on routine patrol on I–40 in Shelby County. Deputy Whitlock had his patrol car positioned where I–40 and I–240 merge, when he noticed a 1996 Ford U–Haul traveling eastbound on I–40 while in the process of navigating a large curve in the interstate. According to Deputy Whitlock, the U–Haul was not speeding at the time. Nonetheless, Deputy Whitlock pulled out behind the U–Haul after it made the turn, to determine whether the driver of the U–Haul engaged in a traffic violation because, as an experienced interdiction officer, Deputy Whitlock was aware that U–Haul trucks were often used to used to transport narcotics. In Deputy Whitlock's words, he pulled out after the vehicle because it was a U–Haul, and because it had been his experience that U–Hauls carry narcotics.

Traveling in his patrol car, Deputy Whitlock then caught up to the U–Haul which was now traveling northbound on I–40. Deputy Whitlock paced himself behind the U–Haul by traveling four to five car lengths behind it for about three-fourths of a mile. When the speed of Deputy Whitlock's vehicle and the speed of the U–Haul were the same, Deputy Whitlock checked his certified speedometer, which showed a reading of sixty-two miles per hour. Although Deputy Whitlock's vehicle was equipped with radar, he was unable to clock the speed of the U–Haul using the radar equipment inasmuch as the two vehicles were traveling in the same direction. Because the speed limit on I–40 in that area is fifty-five miles per hour, Deputy Whitlock stopped the driver of the U–Haul at the Watkins Road exit for speeding.

The driver of the U–Haul was Defendant John Hill. Deputy Whitlock exited his patrol car, approached the driver's side of the U–Haul, and asked John for his driver's license. John produced a Florida driver's license; Deputy Whitlock informed him of the reason for the stop; and asked John to exit the U–Haul and step to the back of the vehicle so that Deputy Whitlock would be clear from the heavy traffic flow. Deputy Whitlock noticed that John's hands were shaking "uncontrollably" at the time John handed his license to Deputy Whitlock. John's brother, and co-defendant in this case, Malcolm Scott

Hill ("Scott"), remained seated in the passenger seat of the U–Haul.

Once out of the vehicle, Deputy Whitlock questioned John about his travel plans, to which John replied that his sister was in the military and had been transferred to Pennsylvania, so he and Scott were moving their sister's belongings from Irvine, California to Scranton, Pennsylvania. Deputy Whitlock, who had been in the military himself, found it unusual that John and Scott would be moving their sister's belongings, inasmuch as it had been Deputy Whitlock's experience that people in the military who were transferred to another location usually had their moving arrangements handled by the military. Deputy Whitlock asked John about his sister's whereabouts at the time, and John replied that she had flown to Scranton about one month earlier. Deputy Whitlock described John's statements made during this colloquy as "very deliberate as if it was rehearsed on what he was supposed to be telling me as to the destination and the reason for their trip." Deputy Whitlock then asked John where he and Scott were from, to which John replied that they were from Florida, and that the two had flown to California to assist their sister.

Deputy Whitlock asked John to be seated in the patrol car so that Deputy Whitlock "could write the ticket, check [John's] driver's license, and also [because] it was kind of windy that night, and it was hard to hear due to all the traffic." Once inside the vehicle, Deputy Whitlock continued to question John about his travel plans as Deputy Whitlock completed John's "courtesy" citation. John informed Deputy Whitlock that he was not sure how long he and Scott were going to remain in Scranton, inasmuch as their sister was married and they just needed to help her "offload," and then they could leave.

Deputy Whitlock then returned to the U–Haul to obtain the rental agreement for the truck from Scott. When asked by Deputy Whitlock about his travel plans, Scott stated that he and John were moving their sister to Scranton, Pennsylvania, and that once they got there they were going to stay approximately three or four days to help her unload and to get settled before they flew back to Florida. Scott produced the rental agreement for Deputy Whitlock; the agreement was in Scott's name; it indicated that the truck had been rented on February 19, 1996; and next to the amount tendered on the rental receipt were the initials "CA," which Deputy Whitlock interpreted to mean that Scott had paid for the rental in cash. According to Deputy Whitlock, the significance of the "CA" notation is that it had been his experience that drug dealers commonly pay for everything in cash. Deputy Whitlock later testified that the fact that the truck had been rented on February 19, just four days before the night in question, aroused his suspicion inasmuch as John had told Deputy Whitlock that his sister had moved to Pennsylvania a month beforehand. As Deputy Whitlock spoke with Scott, he noticed a large amount of used Kleenex on the floorboard of the truck. This also aroused Deputy Whitlock's suspicion inasmuch as it had been his experience that people who "snort" cocaine constantly have a "runny" nose which requires constant wiping.

Deputy Whitlock returned to the patrol car and, while waiting for verification of John's driver's license, asked John to sign the "courtesy" citation. Deputy Whitlock then asked John if he and Scott had helped their sister load the U–Haul, to which John answered in the affirmative. Then, when Deputy Whitlock "confronted [John] with the fact that [his sister] had been gone a month, ... he became somewhat confused and stuttered for a minute and changed his story, saying that she had just laid it out on how they were supposed to load the truck." Deputy Whitlock asked John if he could search the U–Haul, but John refused. The verification of John's license came back and indicated that John's license was valid with no restrictions. At that point, Deputy Whitlock de-

cided to run a canine search using his certified narcotics dog, "Spanky," who was present in Deputy Whitlock's vehicle, and who travels with Deputy Whitlock at all times. Deputy Whitlock later testified that he decided to run the canine search because he had "reasonable suspicion that the possibility of a narcotics transfer was being made due to the fact [of] the inconsistent stories, the nervousness and the demeanor of both subjects." Deputy Whitlock then placed Scott in the patrol car with John, and ran the canine search, which took about one minute to complete. Up until this point, about twelve minutes had passed from the time Deputy Whitlock pulled over the U-Haul.

Spanky gave a "positive" indication for the presence of narcotics by scratching and biting at the part of the U-Haul where the cab meets the box part of the truck. Because of Spanky's response, and Deputy Whitlock's experience with Spanky on other occasions when the canine elicited the same response to the presence of narcotics, Deputy Whitlock believed that narcotics were present in the U-Haul.

At this point, Deputy Kellerhall arrived on the scene and Defendants were placed in Deputy Kellerhall's vehicle. The Deputies searched the cab of the U-Haul, and no narcotics were found; however, the search did turn up a large number of keys in a bag behind the rear seat. The Deputies assumed that one of the keys would unlock the lock on the rear door of the truck; however, none of the keys worked, so the Deputies cut the lock with bolt cutters. In the meantime, Deputy Segerson arrived on the scene with his certified narcotics canine, "Oz;" the canine did a search of the U-Haul and reacted positively to the same area to which Spanky had reacted positively.

Once the lock was cut from the rear door of the U-Haul, the Deputies began their search of the rear of the truck and found, among other things, five large wardrobe boxes located against the back wall nearest the cab. Inside the wardrobe

boxes were what appeared to be tractor tire inner tubes. Deputy Whitlock punctured the tube with his pocketknife, and when he pulled his knife out of the tube, a white substance was on the blade. Deputy Whitlock tested the powder and determined that it was cocaine. Deputy Whitlock then placed Defendants under arrest. The U-Haul was taken into the interstate office; a thorough search of the truck was conducted; and 502 kilograms of cocaine were recovered.

On February 27, 1996, a federal grand jury for the Western District of Tennessee returned a one count indictment against Defendants. The indictment alleged that on February 23, 1996, Defendants possessed with the intent to distribute approximately 502 kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Thereafter, on April 25, 1996, Defendants filed a joint motion to suppress the evidence—502 kilograms of cocaine. A suppression hearing was held on the motion and, following the hearing, both the government and Defendants filed post-hearing briefs. The district court entered an order denying Defendants' motion to suppress the evidence on July 16, 1997. Defendants pleaded guilty to the one count indictment on December 16, 1997, and pursuant to the plea agreements, Defendants reserved the right to appeal the district court's denial of the motion to suppress the evidence.

Defendants were each sentenced on 135 months' imprisonment to be followed by three years of supervised release. This appeal ensued.

## ANALYSIS

The Supreme Court has held that "stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention is quite brief." *Delaware v.*

*Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). An ordinary traffic stop, however, is more akin to an investigative detention rather than a custodial arrest, and the principles announced in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), apply to define the scope of reasonable police conduct. *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir.1996). Reasonable police conduct under such circumstances is such that any subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference. *Palomino*, 100 F.3d at 449 (citing *Terry*, 392 U.S. at 20, 88 S.Ct. 1868). Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir.1998) (*en banc*), *cert. denied*,— U.S. ——, 119 S.Ct. 906, 142 L.Ed.2d 904 (1999); *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir.1995).

 Recently, in *Knowles v. Iowa*, 525 U.S. 113, 119 S.Ct. 484, 488, 142 L.Ed.2d 492 (1998), a unanimous Supreme Court held that a full-blown search of an automobile and its driver, after an officer had elected to issue the driver a traffic citation rather than arresting the driver, violated the Fourth Amendment. Because neither the officer's safety nor the need to preserve evidence was implicated by the routine traffic stop, the Court held that once the driver was stopped for speeding and was issued a citation, all of the evidence necessary to prosecute him had been obtained and, without a reasonable suspicion that other criminal activity was afoot, the stop of the vehicle and issuance of a traffic citation did not justify a full search of the vehicle. *Id.* However, the *Knowles* decision does not change the fact that an officer may detain an individual after a routine traffic stop is completed if

the officer has a reasonable suspicion that the individual is engaged in criminal activity. *See Erwin*, 155 F.3d at 822. Furthermore, *Knowles* does nothing to the state of the well-settled law that the legality of the traffic stop is not dependent upon an officer's motivations. *See Whren v. United States*, 517 U.S. 806, 812–13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir.1993) (*en banc*), *cert. denied*, 513 U.S. 828, 115 S.Ct. 97, 130 L.Ed.2d 47 (1994). That is to say, an officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle. *Whren*, 517 U.S. at 812–13, 116 S.Ct. 1769. If the initial traffic stop is illegal or the detention exceeds its proper investigative scope, the seized items must be excluded under the "fruits of the poisonous tree doctrine." *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The touchstone of the Fourth Amendment is "reasonableness" based upon the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (citing *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)).

 This Court reviews a district court's decision on a motion to suppress the evidence under " 'two complimentary standards. First, the district court's findings of fact are upheld unless clearly erroneous. Second, the court's legal conclusion as to the existence of probable cause is reviewed *de novo*.' " *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir.1994) (quoting *United States v. Leake*, 998 F.2d 1359, 1362 (6th Cir.1993)) (citations omitted). In reviewing the district court's findings of fact, we consider evidence in the light most favorable to the government. *United States v. Buchanon*, 72 F.3d 1217, 1223 (6th Cir.1995). In addition, we must give deference to the district court's assessment of credibility inasmuch as the court was in the best position to make such a

determination. *See United States v. Brad-shaw*, 102 F.3d 204, 210 (6th Cir.1996).

### 1. The Initial Traffic Stop

 In the case at hand, it is questionable as to whether Defendants challenge the district court's finding that Deputy Whitlock had probable cause to make the initial traffic stop of Defendants' U–Haul. Defendants acknowledge in a footnote to their brief that they do not dispute the legality of a pretextual stop after the *Whren* and *Ferguson* decisions; yet, they appear to challenge the district court's finding of probable cause on the basis of Deputy Whitlock's motivation in pursuing their vehicle. Defendants argue that because Deputy Whitlock pursued their vehicle on the basis that it had been his experience that U–Haul trucks carry drugs, his deep-rooted bias colored his thinking. We disagree with Defendants' claim where it is clear that regardless of Deputy Whitlock's motivation in stopping the U–Haul, the stop was valid as long as he had probable cause to make the traffic stop. *See Whren*, 517 U.S. at 812–13, 116 S.Ct. 1769 (holding that the constitutional reasonableness of a traffic stop does not depend upon the officer's actual motivation).[1]

Deputy Whitlock pulled Defendants over for traveling in excess of the speed limit, in that Defendants were traveling sixty-two miles per hour and the posted speed limit in that area is fifty-five miles per hour. As noted by the district court, the Tennessee Code prohibits speeding, *see* Tenn. Code Ann. § 55–8–152, and Defendants do not dispute the fact that they were traveling in excess of the posted speed limit. Therefore, the district court properly concluded that Officer Whitlock had probable cause to make the initial traffic stop. *See United States v. Akram*, 165 F.3d 452, 455 (6th Cir.1999) (finding that where the officer observed a U–Haul failing to signal

before changing lanes in violation of Ohio law, the officer had probable cause to stop the U–Haul irrespective of his subjective motivation for doing so); *Palomino*, 100 F.3d at 449 (finding that where the officer observed the defendant speeding and changing lanes without signaling, "even if [the officer] was motivated by a suspicion that the defendant fit into a drug courier profile, the stop was not unreasonable because probable cause existed").

Notably, in *Akram*, this Court recently had occasion to decide whether a police officer had probable cause to stop a U–Haul truck, where the record indicated that although the officer claimed to have stopped the truck for failing to change lanes without signaling in violation of Ohio law, his "true" motivation for stopping the U–Haul was to look for contraband. 165 F.3d at 455. There, the facts indicate that police officers pulled the U–Haul over two days in a row; that the legal reason for pulling the vehicle over on the first day was questionable (going two miles over the posted speed limit); and that the police officers found illegal videotapes when they searched the vehicle on that day, but that the officers did not arrest the defendants because they did not receive word that they had a legal basis for doing so (i.e., they were not aware of the illegal nature of the tapes) until the defendants had been detained for forty-five minutes and released. *Id.* at 454, 459–60. The facts further indicate that the legal reason for pulling the vehicle over the next day—failure to signal when changing lanes—was not documented on paper anywhere, but brought out near the end of the officer's testimony in a response to a question from the court; and that upon search of the U–Haul, illegal videotapes were found. *Id.* at 454–55, 460.

---

1. We hasten to note that although the Supreme Court has held that an officer's subjective motivations play no role in ordinary, probable cause Fourth Amendment analysis, the Court has held that an officer's actual motivation is considered when a claim is brought under the Equal Protection Clause for selective enforcement of the law based on considerations such as race. *See Whren*, 517 U.S. at 813, 116 S.Ct. 1769.

The two-judge majority in *Akram* reluctantly agreed with the district court's finding that the officer had probable cause to stop the vehicle:

The dissent makes a strong case for disbelieving [the police officer's] explanation for the February 27 stop. We agree that this case is an example of the very questionable police conduct that is permitted by *Whren* and *Ferguson*. Were the author of this opinion writing on a clean slate, she would hold that the police may not use a trivial traffic violation as a pretext for stopping a vehicle, when their real purpose would not justify a stop. We are, however, bound by the opposite holding. While the dissent demonstrates that the officers were uninterested in the traffic violation and were really looking for drugs, the point of *Whren* and *Ferguson* is that the motives of police are irrelevant.

*Akram*, 165 F.3d at 455. However, the dissent found that the district court was clearly erroneous in crediting the police officer's version of what occurred, and in therefore concluding that there was probable cause to stop the vehicle. The dissent focused on the fact that rental trucks such as "U–Hauls" have become "profile" or "target" vehicles, and that "[i]t is clear from the number of cases reaching our court that the police within the Sixth Circuit make full use of the technique of stopping vehicles for minor traffic infractions with the hope that circumstances will develop which ultimately will allow them to make a legal search of the vehicle." *Id.* at 457 (Guy, J., dissenting).

The dissent further opined as follows:

All of the officers involved in this case were part of a highway drug interdiction unit. Although they could, and I assume would, stop vehicles committing egregious traffic offenses, traffic patrol was not their primary mission. Nor do they rely on just "getting lucky" when making truly legitimate traffic stops. This would be a non-productive waste of manpower. It is clear to me from the cases that reach our court—including this one—that the officers are looking for "profile" or "target" vehicles and occupants.

A rental truck is a profile or target vehicle. That this was not admitted by the police officers is not controlling in my view. Credibility is the issue here and, in making credibility determinations, a court can utilize what is specifically part of the record, what has been learned from other similar cases, and all reasonable inferences that can be drawn therefrom. We routinely tell jurors that although they have to decide the case before them on the basis of the testimony and exhibits, they do not have to leave their common sense at the courthouse door. Surely judges, who are more experienced and sophisticated than the average juror about legal matters and court proceedings, are entitled to factor common sense into the credibility equation.

Rental vehicles are profile vehicles because the police know they have become popular with persons transporting contraband. There are several reasons for the popularity. First, they can be obtained at a relatively low cost. Second, when the plates and registrations are checked, they reveal nothing about the vehicle's occupants. Third, they are little more than a large box on wheels and are completely windowless, thus affording privacy to those carrying contraband. Finally, if the vehicle is stopped and contraband is found, there is no worry about forfeiting the vehicle since it does not belong to the wrongdoer.

\* \* \* \* \* \*

Legally, the police can now stop a vehicle for any alleged traffic violation and, while the vehicle is stopped, subject it to a canine sniff or hold the vehicle until a dog arrives on the scene. They also can have a profile and stop target vehicles if they find them committing a traffic offense, but—they still must have a legitimate traffic offense as the basis

for the stop. I do not believe the officers did here—but, more importantly, I do not believe the district judge could properly conclude they did on the basis of this record. The courts have given the police this extraordinary power to make pretextual stops and searches of vehicles, but it is also the responsibility of the courts to make sure the testimony of police officers is given the same critical scrutiny given to a defendant's testimony.

*Akram,* 165 F.3d at 458, 460 (Guy, J., dissenting) (footnotes omitted).

We share in the concern that police officers are using the state of the law in this Circuit as carte blanche permission to stop and search "target" or "profile" vehicles for drugs. Of course, the Supreme Court in *Whren* confirmed that a police officer is legally allowed to stop a vehicle for a traffic violation when there is probable cause for the traffic stop, without regard for the officer's subjective motivation. *See* 517 U.S. at 812–13, 116 S.Ct. 1769. However, we agree that it is the responsibility of the courts to make sure that police officers act appropriately and not abuse the power legally afforded to them by, among other things, carefully scrutinizing a police officer's testimony as to the purpose of the initial traffic stop. Although U–Hauls may in fact be used to carry illegal contraband, the potential for police officers to abuse the *Whren* principle is apparent, and when applied to "target" vehicles such as U–Hauls—which are typically used by lower income people to move who do not have many personal belongings and cannot afford the expense of a professional moving company, or typically used by young college students making their first move from home—the abuse becomes particularly distasteful.

In the case at hand, the facts related to the purpose of the stop are essentially not in dispute and, as stated, it is questionable whether Defendants even challenge the propriety of the stop. Although Deputy Whitlock testified that he began following Defendants because they were traveling in a U–Haul and it has been his experience that U–Hauls carry contraband, his legal reason for initially stopping the vehicle— speeding—is not challenged here to the extent that Defendants do not claim that they were traveling at the posted speed limit. Furthermore, by speeding Defendants were in fact committing a traffic infraction under Tennessee law. Therefore, under *Whren, Ferguson* and their progeny, the district court's conclusion that Deputy Whitlock had probable cause to stop the U–Haul must be upheld.

 This, however, is not the end of the relevant inquiry, and leads to another check on the authority provided to police officers under *Whren* —the fact that the officer must conduct the stop with the least intrusive means reasonably available and not detain the individual longer than necessary to effectuate the purpose of the stop, unless the officer has an articulable reasonable suspicion that the individual is engaged in criminal activity. *See Mesa,* 62 F.3d at 162–63. As with the concern that the courts must be particularly careful in scrutinizing a police officer's purpose for initially stopping a "target" vehicle, we believe that the courts must also carefully scrutinize a police officer's conduct during the course of such a stop to insure that it is limited to effectuating the purpose of the stop. Likewise, the courts must carefully scrutinize an officer's stated reasons for detaining the individual beyond the purpose of the stop to insure that the reasons rise to the level of reasonable suspicion, so that the officer does not abuse his authority under *Whren.*[2]

## 2. Detention

Defendants focus their argument on appeal on the reasonableness of their deten-

---

2. Notably, the defendant in *Akram* did not challenge whether the officers had a reasonable suspicion to detain him for forty-five minutes beyond the scope of the initial stop. 165 F.3d at 456 n. 4.

tion by Deputy Whitlock. Defendants argue that Deputy Whitlock 1) unreasonably questioned them beyond the scope of the traffic stop, 2) deliberately conducted the stop in such a fashion so as to prolong the time necessary to complete the purpose of the traffic stop, and 3) did so without an articulable reasonable suspicion. We disagree.

**a. Questioning by Deputy Whitlock and His Method of Conducting the Initial Stop (Defendants' First and Second Arguments)**

Defendants argue that Deputy Whitlock improperly engaged in a series of questions unrelated to the stop. The questions to which Defendants take issue related to whether Defendants were "moving" and, if so, where they were moving to and from. Defendants contend that such questions were improper because they did not relate to the purpose of the stop—speeding—and because Deputy Whitlock could not have had a reasonable suspicion to question Defendants outside the scope of the stop inasmuch as Deputy Whitlock began asking John these questions immediately after the stop.

 In *Erwin*, an *en banc* panel of this Court held as follows:

[I]rrespective of whether the deputies were justified in detaining [the defendant] after he showed no signs of intoxication, and even if they had not, after approaching [the defendant], observed conditions raising reasonable and articulable suspicion that criminal activity was "afoot," they were entitled to ask [the defendant] for permission to search his vehicle. A law enforcement officer does not violate the Fourth Amendment merely by approaching an individual, even when there is no reasonable suspicion that a crime has been committed, and asking him whether he is willing to answer some questions.

155 F.3d at 822–23 (citing *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). Although it is true that the Supreme Court stated in *Royer* that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, [while] the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," *see* 460 U.S. at 500, 103 S.Ct. 1319, Deputy Whitlock's questioning of John as to his moving plans at the outset of the stop was reasonable in that the questions related to John's purpose for traveling. *See Erwin*, 155 F.3d at 822–23; *see also United States v. Potts*, No. 97–6000, 1999 WL 96756, at *3 (6th Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 66, —— L.Ed. 2d —— (1999) (finding that "an officer is free to ask traffic-related questions, and questions about a driver's identity, business and travel plans during the course of a traffic stop").

 Defendants also contend that Deputy Whitlock consciously tailored the stop to·draw out its duration so as to allow time to investigate his "hunch" that Defendants were using the U–Haul to transport drugs. Specifically, Defendants argue that Deputy Whitlock ran a check on John's driver's license late in the stop, separated Defendants, and did not request the rental agreement from John when he initially asked for John's driver's license. Defendants note that four minutes and seventeen seconds transpired from the time Deputy Whitlock called John's driver's license into dispatch for verification until the time Deputy Whitlock received the results. Defendants argue that if Deputy Whitlock had performed the driver's license check at the beginning of the stop, instead of after he had already questioned John, the purpose of the stop would have been· over when Deputy Whitlock handed John the courtesy citation (i.e., the verification of the license would have been received). Defendants conclude that this factor is significant inasmuch as the government includes events which occurred after John was handed the citation as

grounds for Deputy Whitlock's reasonable suspicion that criminal activity was afoot. We disagree with Defendants' contention, where the record shows that Deputy Whitlock did not purposefully extend the purpose of the traffic stop and, as discussed *infra*, during the course of the stop Deputy Whitlock was developing reasonable suspicion that criminal activity was afoot.

The stop occurred at approximately 20:41:35; after a brief conversation with Deputy Whitlock, John was asked to have a seat in the patrol car at approximately 20:43:27; less than seven minutes later, Deputy Whitlock ran the license check; and the driver's license verification came back four minutes and seventeen seconds after it was requested. The record indicates that during the period of time from which Deputy Whitlock asked John to have a seat in the patrol car until the time that he ran the check on John's driver's license, Deputy Whitlock wrote out the courtesy citation, retrieved the rental agreement from the U–Haul, spoke with Scott, and returned to the patrol car. Upon returning to the patrol car, Deputy Whitlock ran the check on John's driver's license and while waiting for the results, questioned John about his travel plans once again inasmuch as Scott's description of the travel plans was inconsistent with John's description. Upon receiving the notification that John's license was valid in the state of Florida, Deputy Whitlock then placed Scott in the patrol car with John and proceeded to allow Spanky to do a canine sniff of the U–Haul.

Based upon the above factual scenario, the district court's findings of fact on this issue were not clearly erroneous. The district court specifically found as follows regarding Defendants' detention:

> In the present case, defendants cannot successfully claim that the detention, from its inception through the return of the diver's license check, exceeded its original scope. It is uncontested that in a valid traffic stop, an officer can request a driver's license, registration or rental papers, run a computer check thereon, and issue a citation. In this case, Whitlock asked John Hill to produce his driver's license and to exit the vehicle. He then requested that John Hill sit in the front of the police car while Whitlock filled in the courtesy citation. Whitlock then left the vehicle to obtain rental papers. When he returned, Whitlock called for a computer check of the license. While waiting for verification of John Hill's license, Whitlock gave the courtesy citation to John Hill for his signature.
>
> The questioning occurred while Whitlock performed these tasks and waited for the results of the computer check. Therefore, the questioning did nothing to extend the duration of the initial, valid stop. Furthermore, the entire traffic stop, up to the return of the computer check, lasted little more than twelve minutes. Contrary to defendants' contentions, there is simply no indication that Whitlock intentionally prolonged the stop by delaying the license check, separating the defendants, or requesting the rental papers. Whitlock was entitled to perform these tasks and did so in a sufficiently efficient manner, as was his standard procedure.

(J.A. at 45–46) (footnotes omitted).

When viewing the course of events which took place at the time of the stop under a totality of the circumstances and in the light most favorable to the government, the district court properly found and concluded that the detention, from its inception through the return of the driver's license check, did not exceed its original scope. As noted *supra*, the touchstone of the Fourth Amendment is reasonableness based upon the totality of the circumstances. *See Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). To accept Defendants' position that Deputy Whitlock purposefully tailored the stop to draw out its duration would require the Court to view the stop not under the totality of the circumstances but,

rather, in an unreasonable piecemeal fashion so as to draw a bright line limitation as to an officer's course and conduct during a stop. *See United States v. Place*, 462 U.S. 696, 709, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) ("declin[ing] to adopt an outside time limitation for a permissible *Terry* stop"). Of course, one must be mindful of the police officer's duty to conduct the stop with the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time, *see Royer*, 460 U.S. at 500, 103 S.Ct. 1319; however, nothing in the record suggests that Deputy Whitlock's actions were unreasonable. *See United States v. Bradshaw*, 102 F.3d 204, 212 & n. 18 (6th Cir.1996) (finding that the police officer lawfully detained the "nervous" and "jittery" defendant in the patrol car after the initial stop until the officer performed the radio checks and issuance of the citation, and noting that "*Mesa* does not require that reasonable suspicion be present 'upfront' for an officer to detain a motorist in his squad car while conducting a records search that is related to the traffic violation for which the motorist was stopped").

Furthermore, even if Deputy Whitlock had run the driver's license check at the outset of the stop—i.e., when he initially placed John inside the patrol car—that still would have provided Deputy Whitlock four minutes and seventeen seconds to ask Scott about the travel plans and to determine that Scott's answers were inconsistent with John's answers about the plans, such that Deputy Whitlock would have determined it necessary to have Spanky do a canine sniff of the U–Haul. In short, accepting Defendants' argument does nothing to change the fact that Deputy Whitlock still would have had time to further develop his reasonable suspicion that Defendants were in engaged in criminal activity.

**b. Whether Deputy Whitlock had Reasonable Suspicion of Criminal Activity (Defendants' Third Argument)**

■ Defendants argue that the district court erred when it found that Deputy Whitlock had reasonable suspicion to detain Defendants after the completion of the traffic stop. Specifically, Defendants note that verification of John's valid Florida driver's license was received by Deputy Whitlock before he ran the canine search of the U–Haul, and conclude that because they were detained without reasonable suspicion while Deputy Whitlock conducted the canine search, the positive results of the canine search should have been suppressed. Defendants contend that the district court's findings as to why Deputy Whitlock held a reasonable suspicion are clearly erroneous when taken individually as well as when considered in total, inasmuch as Deputy Whitlock lacked credibility. We disagree.

When addressing whether Deputy Whitlock had a reasonable suspicion that Defendants were engaged in criminal activity so as to detain them beyond the purpose of the traffic stop—i.e., so as to allow Deputy Whitlock to detain Defendants for the approximately one or two minutes it took Spanky to run the search of the vehicle, the district court found as follows:

> In forming his suspicions, Whitlock was entitled to assess the circumstances and defendant's [sic] in light of his experience as a police officer and his knowledge of drug courier activity. *See United States v. Cortez*, 449 U.S. 411, 416, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) ("[E]vidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."); *United States v. Finke*, 85 F.3d 1275, 1280 (7th Cir.1996).

> Whitlock testified that his suspicions were aroused by a number of factors: 1) the unusual explanation of the defendants' cross-country trip, 2) the deliberate, or rehearsed, manner in which John Hill answered Whitlock's questions, 3) the apparent cash rental of the U–Haul truck, 4) John Hill's uncontroll-

ably shaky hands and apparent nervousness, 5) the sweating and apparent nervousness of the passenger Malcolm [Scott] Hill, 6) the inordinate number of used Kleenex littering the U–Haul's floorboard, 7) John Hill's confusion in explaining how and when his sister's furniture had been loaded, and 8) the defendants' inconsistent responses regarding their itinerary.

When questioned by Whitlock about their purpose and destination, defendants indicated that they had flown cross-country from Florida to California to help their sister make a military transfer to Scranton, Pennsylvania. Defendants also explained that their sister had already moved and had been in Pennsylvania for a month. Whitlock found it unusual that the defendants' sister would have her brothers fly cross-country to help her move when the military normally paid for military moves and took care of such arrangements. Whitlock's skepticism of defendant's [sic] explanation was confirmed, as previously noted by the court, through Dabney's testimony. Whitlock's suspicion was justifiably aroused and contributed to a reasonable suspicion of illegal activity.

\* \* \* \* \* \*

The defendants' nervous behavior, Scott Hill's profuse perspiration, and John Hill's deliberate responses also caught Whitlock's attention....

Within the course of the traffic stop, Whitlock also noticed that the U–Haul rental agreement contained the notation "CA" across from the amount tendered. Whitlock reasonably assumed "CA" to indicate that the U–Haul had been paid for in cash. In Whitlock's experience on the Interstate Interdiction Unit, U–Haul vehicles had been used to transport illegal drugs on numerous occasions. Furthermore, Whitlock testified that it was common for drug couriers to pay for such rentals in cash to maintain anonymity....

Inside the U–Haul, Whitlock noticed an inordinate number of Kleenex on the floorboard, which he believed to be a possible indication of cocaine use....

Whitlock's suspicions were also aroused by inconsistent statements by defendants regarding their travel plans.... Although the inconsistency between the two stories is slight, when viewed in light of the many other suspicious factors surrounding the stop, it was not unreasonable for Whitlock to focus on these discrepancies.

Taken individually, some of the factors establishing reasonable suspicion in this case would be susceptible to innocent explanations. The totality of the circumstances, however, plainly supported a reasonable suspicion of illegal activity. Therefore, the detention to allow for a dog sniff was permissible.

(J.A. at 48–51) (footnote and citations omitted). In short, the district court found that Deputy Whitlock possessed a reasonable suspicion that Defendants were engaged in the transportation of illegal drugs so as to detain Defendants for an additional minute or so beyond the purpose of the stop based upon 1) Defendants' implausible explanation for their cross-country trip; 2) Defendants' inconsistent statements regarding their travel itinerary; 3) the possibility that at least of one of the Defendants were using cocaine; and 4) the Defendants' nervous demeanor during the stop.

In *United States v. Cortez*, the Supreme Court set forth parameters to determine an articulable suspicion as follows:

Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particular-

ized and objective basis for suspecting the particular person stopped of criminal activity.

The [assessment of the whole picture] does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (citations omitted). Applying these principles to the facts of the instant case, the district court properly concluded that Deputy Whitlock detained Defendants beyond the duration of the traffic stop based upon a reasonable suspicion that Defendants were engaged in the transportation of drugs, where the district court's findings of fact were not clearly erroneous.

It is reasonable to conclude that one of the factors contributing to Deputy Whitlock's suspicion that Defendants were engaged in criminal activity was Deputy Whitlock's belief that Defendants provided an implausible explanation for their trip—moving their sister who was in the military from California to Pennsylvania because she had been relocated. This explanation aroused Deputy Whitlock's suspicions inasmuch as it had been his experience that people in the military did not have to move their belongings themselves when relocated; the military moved the belongings for them. Defendants argue that because they presented testimony from Dawn Dabney, a civilian employee at the Millington Naval Reserve Center, stating that military personnel are given the option of moving themselves (a "Do–It–Yourself" or "DITY" move), and about twenty-five percent of the military moves are done in such a fashion, the district court's finding was

clearly erroneous. We disagree where Dabney's testimony also indicates that seventy-five percent of military moves are handled in the fashion in which Deputy Whitlock believed they are handled.

Furthermore, it is also reasonable to conclude that Defendants' inconsistent stories regarding their travel itinerary—i.e., John claiming that he and Scott were just going to drop off their sister's belongings and then leave; Scott claiming that the two were going to stay about three or four days and then leave; John claiming that their sister had flown out to Pennsylvania about a month beforehand, then claiming that she had assisted them in loading the truck, then claiming that she laid the belongings out for the men to load before she left—also contributed to Deputy Whitlock's suspicion that Defendants were engaged in criminal activity. Finally, it was reasonable to conclude that Deputy Whitlock's observance of the large amount of used Kleenex on the floorboard of the truck, indicating that one or both of Defendants were using cocaine based upon his experience as an interdiction officer that cocaine users have to wipe their noses often, as well as Defendants' nervous demeanor contributed to his suspicion that criminal activity was afoot. *See Palomino*, 100 F.3d at 450 (finding that the defendant's inconsistent stories about the ownership of the car and purpose of the trip, his nervousness, and the odor that the police officer smelled when the defendant rolled down his window aroused a reasonable suspicion of criminal activity justifying the officer's inquiry into whether the defendant was carrying contraband).

Accordingly, when viewing the evidence in the light most favorable to the government and under a totality of the circumstances using a common-sense approach, the district court did not err in finding that Deputy Whitlock had formed a reasonable suspicion that Defendants were carrying contraband sufficient to justify extending the purpose of the traffic stop to allow Spanky to do a canine sniff of the U–Haul.

We are not persuaded otherwise by Defendants' attack on Deputy Whitlock's credibility, where the district court credited Deputy Whitlock as being a credible witness and where nothing in the record supports Defendants' contention to the contrary. *See Bradshaw*, 102 F.3d at 210 (finding that because the district court was in the best position to judge credibility, and because the court plausibly resolved the discrepancies in the testimony, its findings of fact should not be disturbed); *compare Akram*, 165 F.3d at 457–60 (Guy, J., dissenting) (finding the district court's findings of fact clearly erroneous based upon the incredible nature of the officer's testimony).

### 3. Search

■ Defendants challenge the district court's conclusion that Deputy Whitlock had probable cause to search their U–Haul as a result of a positive indication by Spanky, only to the extent that Defendants challenge Spanky's training and reliability. Defendants do not challenge the fact that a positive indication by a properly trained narcotics detecting dog is sufficient to establish probable cause to search for the presence of a controlled substance. We believe that Defendant's argument is without merit.

■ One of the exceptions to the requirement that the government obtain a warrant before searching private property is the "automobile exception," which excuses the police from obtaining a warrant when they have probable cause to believe that a vehicle they have stopped contains evidence of a crime. *See United States v. Pasquarille*, 20 F.3d 682, 690 (6th Cir. 1994) (citing *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). It is well-established in this Circuit that an alert by a properly-trained and reliable dog establishes probable cause sufficient to justify a warrantless search of a stopped vehicle. *See United States v. Diaz*, 25 F.3d 392, 394 (6th Cir.1994).

Defendants contend that the district court's finding that Spanky was a properly trained and reliable drug detection dog was clearly erroneous because Deputy Whitlock testified that he did not know exactly what training he was actually required to perform with Spanky as his handler, and because Deputy Whitlock failed to keep records of the number of times Spanky indicated a "false alert." Essentially, Defendants challenge the government's failure to produce records to establish Spanky's training and reliability.

In *Diaz*, this Court rejected a similar argument on the basis that despite the lack of the production of records, the credible testimony established the dog's ("Dingo's") proper training and reliability. *See* 25 F.3d at 395. Specifically, in *Diaz*, "[the defendant] argue[d] that the government could not establish Dingo's reliability because [the officer] failed to bring the dog's training and performance records to court and so was unable to answer precisely how many searches Dingo had done and how many times drugs were not discovered when Dingo indicated, [and because] ... [the officer] and Dingo were improperly trained." *Id.* In rejecting the defendant's claim and finding that the district court's finding of fact as to Dingo's reliability was not clearly erroneous, the Court stated that "[the officer] testified as to her and Dingo's training, certification, and experience. The district judge heard the testimony and made a credibility determination: [the officer] was believable. [The officer's] testimony supports a finding that Dingo was trained and reliable. After reviewing the record, we are not left with a definite and firm conviction that a mistake has been made." *Id.*

Likewise, in the instant case, after reviewing the record we are not left with a firm and definite conviction that a mistake has been made regarding the district court's finding that Spanky was trained and reliable. Testimony from Lieutenant Mark Robinson indicated that he had been the supervisor of the canine unit for the

past eight years and was a certified canine trainer. Lieutenant Robinson testified that he trained both Deputy Whitlock to be a canine handler and Spanky to be a drug detection dog. Lieutenant Robinson described the extensive procedures under which Spanky was trained, and stated that Spanky passed each level of the extensive training such that Spanky was a certified drug detection dog. In addition, Lieutenant Robinson testified that Spanky passed post-certification training as well. Finally, Lieutenant Robinson stated that he had reviewed the training and performance records kept by the Shelby County Sheriff's Department on Spanky and other drug detection dogs, and in his professional opinion, Spanky was reliable.

Accordingly, as in *Diaz*, Defendants' challenge to the district court's finding that Spanky was a properly trained and reliable drug detection dog must fail. Deputy Whitlock therefore had probable cause to search the U-Haul inasmuch as Spanky gave a positive alert to the presence of drugs when Deputy Whitlock ran the canine search. *See Diaz*, 25 F.3d at 394-95.

## CONCLUSION

In summary, the district court properly found that Deputy Whitlock had probable cause to stop Defendants for speeding; properly found that Deputy Whitlock had a reasonable suspicion to detain Defendants beyond the purpose of the stop; and properly found that Deputy Whitlock had probable cause to search the U-Haul based upon Spanky's alert. Accordingly, we conclude that the district court did not err in denying Defendants' motion to suppress the 502 kilograms of cocaine found in the U-Haul. We therefore **AFFIRM** the district court's order denying Defendants' motion to suppress the evidence.