**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0711n.06

No. 14-3794

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Oct 23, 2015
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) ON APPEAL FROM THE UNITED |
| Plaintiff-Appellee, | ) STATES DISTRICT COURT FOR |
| | ) THE NORTHERN DISTRICT OF |
| v. | ) OHIO |
| | ) |
| ALEXIS PEREZ, | ) |
| | ) OPINION |
| Defendant-Appellant. | ) |
| | ) |
| | ) |

BEFORE: GRIFFIN and DONALD, Circuit Judges; TARNOW, District Judge.[*]

**ARTHUR J. TARNOW, Senior District Judge**. Alexis Perez appeals his conviction and sentence for five heroin offenses. The district court sentenced Defendant to 240 months of imprisonment. For the following reasons, we AFFIRM Defendant's convictions and sentence.

## I. PROCEDURAL BACKGROUND

On June 27, 2012, the Government indicted Defendant, along with eleven other co-defendants,[1] for (I) conspiracy to possess with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A); (II) & (III) possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); (IV) possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B); and (V) aiding and abetting

---

[*] The Honorable Arthur J. Tarnow, United States Senior District Judge for the Eastern District of Michigan, sitting by designation.
[1] State law enforcement originally indicted Defendant in 2009 for the conduct underlying in Counts II, III, and IV.

possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B);

(IX) use of a communication facility to facilitate a drug trafficking offense, in violation of

21 U.S.C. § 843(b).

Defendant filed a *pro se* motion to suppress the evidence and statements collected

during the search and seizure at the residence on the ground that the warrant's subject was

never named or positively identified, but only referred to by an alias. The district court

construed three additional grounds: (1) there was no probable cause to search the residence

or Defendant's person; (2) the police unconstitutionally detained Defendant while executing

the search warrant; and (3) Defendant's statements were taken in violation of *Miranda*. The

district court denied the motion except as to one self-incriminating statement made to

Detective Greg Wilson. A jury subsequently convicted Defendant and the district court

sentenced him pursuant to an enhanced minimum.

## II. FACTUAL BACKGROUND

In April 2009, the Mahoning Valley Task Force began investigating a suspected

drug dealer known as "Scar." When Hassan Floyd was arrested on drug trafficking and

RICO charges, he offered to cooperate with police and provide information about "Scar."

With Floyd's assistance, the Task Force executed two controlled buys, on May 8, 2009 and

May 12, 2009. In both instances, Floyd purchased small quantities of heroin from "Scar."

After failing to learn the dealer's legal name, Officer Randall Williams applied for

and received a search warrant for (1) "'FNU' 'LNU'[2] AKA 'Scar' male, Hispanic 5' 10"

185 lbs. with black hair," and (2) the "premises known as 2211 Glenwood Avenue."

---

[2] "FNU LNU" indicates "first name unknown, last name unknown.

Police executed both the personal and residential components of the search warrant on May 14, 2009. While preparing to execute the search warrant for the Glenwood residence, law enforcement maintained surveillance on 2211 Glenwood Avenue. Before police executed the warrant, surveillance witnessed a man and a woman exit the residence. *Id.* The woman (later identified as Rachel Diaz, Perez's girlfriend) entered the driver's seat of a gray vehicle, and the male (later identified as Perez) sat in the passenger seat.

Police, including Officer Williams, started to follow the vehicle after it was "[a] couple of blocks" away from the residence. The car first went to Gina's Drive-Thru, located north of the Glenwood residence, and the police continued to follow as it traveled southbound on Glenwood Avenue back toward the premises at issue. At this point, police were executing a search warrant at the residence and official vehicles were visibly around the house. At this point, surveillance observed Defendant's car turn away from the residence and onto Lake Drive. Defendant was driving away from the residence when the police stopped the vehicle. The police justified the stop on the basis of the warrant for "Scar's" person, not on any purported traffic violation.

During the traffic stop, officers took Perez out of the car, patted him down, and handcuffed him. During the search, the police confiscated money, keys, and cell phones found on Perez's person. The police called the phone number used to set up the controlled buys with "Scar," and one of the confiscated phones rang. After the search, police placed Perez, still handcuffed, in the back of a police cruiser. At trial, police testified that Perez was not free to leave, but that he was not under arrest at this point.

Both Perez and Rachel Diaz were driven back to the Glenwood residence. Police had already begun their search of the Glenwood residence when Officer Williams arrived with

Perez. Initially, police held Perez on the porch for ten to fifteen minutes. They then transferred Perez to the room where they were collecting and cataloguing inventory. Officer Robin Lees explained that his department purposely "seat[s] the suspect in the investigation" in the area where the evidence acquired during the execution of the search warrant is assembled. Law enforcement did not read Perez his *Miranda* rights. At this point, Perez allegedly made his first incriminating statement: that the heroin the police found in the house belonged to him.

Officer Lees testified that Defendant became loud and belligerent in the inventory room, so he transferred Perez to the Mahoning Valley Task Force Office. During the transport, Defendant made further incriminating admissions. He confessed that the heroin at the Glenwood residence belonged to him and that he sold heroin because a disability prevented him from working.

At the task force office, Lees placed Defendant in an interview room. Lees did not activate the room's audio and video recording systems. Perez then made another incriminating statement. Specifically, he talked about his heroin connections to New York and his practice of only selling to adult customers. At some point, Detective Greg Wilson arrived and entered the interview room. Defendant asked Detective Wilson about Rachel Diaz and insisted she did not know about the heroin trafficking. At no point did officers read Defendant his *Miranda* warnings.

Several years after state law enforcement arrested Defendant, the federal law enforcement became involved in this case through the investigation of suspected drug dealer John Perdue. The FBI learned that Perdue bought heroin from Tyrone Gilbert. This investigation led to a search of a home on Brentwood Avenue that belonged to John Helms,

Gilbert's uncle. Law enforcement found three individuals in the home: Helms, Defendant, and Sylvester Cox. When police entered the home, Helms "sprang up," "ran towards the dining room area," and barricaded himself in the bathroom with multiple packages of heroin. Perez was in a bedroom in the northwest of the house. He had no drugs on his person, and cooperated with officers during the search.

Following the search of his home, Helms attempted to persuade his nephew to claim ownership of the drugs. When that failed, he unsuccessfully attempted to convince Defendant to do the same.

In 2012, a federal grand jury indicted Defendant, Gilbert, Perdue, Helms, and eight other codefendants. Perez proceeded *pro se* throughout a substantial portion of the pre-trial period. One month before trial, Defendant elected to have standby counsel officially represent him.

The Government introduced Defendant's incriminating statements at trial several times. Floyd, Gilbert, and Helms all cooperated with the Government and testified against Defendant. Additionally, although this case involved only drug related crimes, Agent Guy Hunneyman testified many times about the involvement of Perez's codefendants in violent gang related crimes, including the murder of a conspirator.

The jury convicted Defendant on all counts. Defendant proceeded to sentencing *pro se*. The prosecution filed an Information to trigger an enhanced mandatory minimum under 21 U.S.C. § 851. Defendant disputed the constitutionality of applying the enhanced minimum without submitting the fact of a prior conviction to the jury. The judge applied the mandatory minimum sentence and sentenced Defendant to two hundred and forty months of incarceration (20 years). Defendant now appeals his conviction and sentence.

### III. ANALYSIS

### A.

First, Defendant argues that the warrant related to the May 14, 2009 search of his person on Lake Drive violated the Fourth Amendment's particularity requirement by failing to include the target's name or other basic identifying information; that Officer Williams' purported knowledge of "Scar's" identity is irrelevant; and that upholding the validity of the warrant would usurp the neutral magistrate's role. Defendant argues that for these reasons, the district court should have suppressed the evidence seized as a result of the search of his person.

"The grant or denial of a motion to suppress is a mixed question of fact and law. On appeal, we review the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Ellis*, 497 F.3d 606, 611 (6th Cir. 2007). In reviewing the district court's findings of fact, the Court takes the evidence in the light most favorable to the Government. *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). This Court reviews *de novo* a district court's determination of particularity. *United States v. Richards*, 659 F.3d 527, 536 (6th Cir. 2011).

First, the Court must decide the scope of the information that it may consider in its particularity analysis. Particularity is a facial requirement of the warrant itself and the Fourth Amendment requires particularity in the warrant, not in the supporting documents. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). The Fourth Amendment, however, does not prohibit a warrant from incorporating the content of other documents by reference. *Id*. In order to use an affidavit or supporting document, the warrant must incorporate the

affidavit by reference and the affidavit had to have been attached to the warrant. *Id.*, at 557–58.

The warrant at issue here only contains boilerplate language referring to the affidavit supporting the warrant, stating: "Affidavit having been made before me by Sergeant Randall Williams . . . I am satisfied that the Affidavit(s) and any recorded testimony establish probable cause . . ." R. 332-6. In *Groh*, the Supreme Court rejected materially similar language as failing to incorporate the affidavit by reference. *Id.* at 554–55 ("The warrant did not incorporate by reference the itemized list contained in the application. It did, however, recite that the Magistrate was satisfied that the affidavit established probable cause to believe that contraband was concealed on the premises, and that sufficient grounds existed for the warrant's issuance."). A warrant's lack of incorporation by reference alone is sufficient to conclude that the Court may not utilize the affidavit. However, here the record does not establish—and the Government does not allege—that Officer Williams's affidavit was attached to the warrant during the May 14, 2009 search. Although the Government relies on Officer Williams' affidavit, the Court may not utilize the affidavit in its particularity analysis.

Next, the Court must decide whether the information contained in the warrant alone is sufficiently particular. "The Fourth Amendment requires warrants to 'particularly describe the place to be searched, and the persons or things to be seized.'" *United States v. Gardiner*, 463 F.3d 445, 471 (6th Cir. 2006) (internal citation omitted). "The warrant must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized." *Id.* In a warrant, "a description is valid if it is as specific as the circumstances and

the nature of the activity under investigation permit." *United States v. Hanna*, 661 F.3d 271, 286 (6th Cir. 2011) (internal citation and punctuation omitted).

The district court concluded that the original single search warrant actually functioned as two separate warrants, given that Defendant was stopped not in the immediate vicinity of the place to be searched. R. 268. Therefore, only the information pertaining to Defendant's person—and not any of the enumerated items[3]—are relevant to our particularity inquiry here. The warrant referred to Defendant by the alias by which police knew him—"Scar"— and provided a description of his height, weight, ethnicity, and hair color.

The Government contrasts the facts of two cases to illustrate why the warrant here was sufficiently particular. In *United States v. Doe*, 703 F.2d 745 (3d Cir. 1983), the Third Circuit held that a warrant did not sufficiently describe a person where the description was "John Doe a/k/a Ed." In *United States v. Ferrone*, 438 F.2d 381 (3d Cir. 1971), the Third Circuit upheld a warrant where the description was "John Doe, a white male with black wavy hair and stocky build observed using the telephone in Apartment 4-C 1806 Patricia Lane, East McKeesport, PA." The facts here are more similar to those in *Doe* than in *Ferrone*, even though the warrant here also included a physical description of the target and a place where he could be found.

The use of such fictitious names or aliases in warrants, *without more*, violates the requirements of the Fourth Amendment. *United States v. Swanner*, 237 F. Supp. 69, 71

---

[3] "Search warrants are not directed at persons; they authorize the search of 'place[s]' and the seizure of 'things'" and persons. *Zurcher v. Stanford Daily,* 436 U.S. 547, 555 (1978); *see also United States v. Pinson,* 321 F.3d 558, 564 (6th Cir. 2003). The search warrant here originally gave police probable cause to search a place—211 Glenwood Avenue—for a list of things, as well as a person known only as "Scar."

(E.D. Tenn. 1964) (emphasis supplied). Some further description of the person intended to be designated by the warrant is required. *Id.* "Where a name that would reasonably identify the subject to be arrested cannot be provided, then some other means reasonable to the circumstances must be used to assist in the identification of the subject of the warrant." *Id.*

The warrant here satisfies the Fourth Amendment's particularity requirement because it contains both Defendant's alias and a physical description of him. This description does not violate the rule in *Swanner* that a warrant may not contain only a suspect's alias. The description is "as specific as the circumstances and the nature of the activity under investigation permit." *Hanna*, 661 F.3d at 286. Therefore, the warrant did not usurp the role of the neutral magistrate.

Defendant argues that the warrant for his person effectively had no geographical limitation. This is a mischaracterization both of how the warrant was written and how the police executed it. The police were following Defendant from Gina's Drive-Thru. Taking the evidence in the light most favorable to the Government, as we must, Defendant was on his way back to the residence, but changed course upon observing police executing a search warrant of the residence. *Hill*, 195 F.3d at 264. The evidence indicates that police would have seized and searched Defendant at the residence had he not attempted to evade the police. If we are to accept Defendant's argument that the warrant had no geographical limitation, that would be tantamount to saying a suspect can affect the constitutionality of a warrant by fleeing. The particular facts of this case, whereby police maintained constant surveillance of a suspect reasonably described in a warrant, who leaves the premises to be searched and then is obviously returning to those premises, support the validity of the warrant here.

Defendant argues that the warrant was not "as specific as possible given the circumstances." Specifically, Defendant argues that the warrant could have noted his approximate age, eye color, hair length, facial hair, distinguishing features, or the presence or absence of tattoos or earrings. As to distinguishing features, including tattoos and earrings, the lack of their notation most likely indicates their absence. It could also indicate that the police had not noticed any such features. There is no requirement that the warrant must be completely accurate. Eye color is not a trait that is easily observable from a distance. Approximate age is not necessarily an easy estimation; the inclusion of an incorrect guess could make the warrant misleading. Hair length and facial hair are mutable features and, therefore, minimally useful for the purposes and protections of a warrant. In short, there is no indication that the warrant was not "as specific as the circumstances and the nature of the activity under investigation permit." *Hanna*, 661 F.3d at 286.

Finally, on a policy note, the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates. *Leon,* 468 U.S. at 916. There is no indication that the police committed misconduct when they relied on the warrant to stop Defendant. The police had maintained uninterrupted surveillance of Defendant since he had left the place described in the warrant and attempted to follow him back to the residence. Defendant, however, attempted to evade the search upon observing police searching the residence, which caused police to stop him. In fact, the police's placement of a call to the number "Scar" utilized to traffic heroin upon recovery of a cellular telephone from Defendant's person indicates that the police wanted to ensure they had stopped the warrant's target. Because the warrant was sufficiently particular, we need not address the parties' arguments regarding the good faith exception to the exclusionary rule.

**B.**

Second, Defendant argues that the police violated his Fourth Amendment rights when they transferred him from the stop location on Lake Drive to the Glenwood residence and continued to detain him. Defendant relies on *United States v. Bailey*, 133 S. Ct. 1031 (2013) to argue that *Michigan v. Summers*, 452 U.S. 692 (1981) does not justify his continued detention.

The Court in *Summers* held that police may detain occupants of a premises upon which they are executing a search warrant without any particular suspicion that the occupants were involved in criminal activity. *Id.*, at 705. The Court clarified that *Summers* does not apply "to the detention of recent occupants beyond the immediate vicinity of the premises to be searched." *Bailey*, 133 S. Ct. at 1041. Defendant was not initially detained within the immediate vicinity of the Glenwood residence. *Summers*, therefore, does not justify Defendant's detention.

The Government argues that *Bailey* is materially distinguishable from the facts here because the warrant in *Bailey* did not describe the defendant detained. In *Bailey*, the police merely followed a former occupant of the premises they planned to search. Here, the warrant particularly described Defendant as a specific person to be searched.

Defendant argues that even if the warrant for his person is valid, his continued detention without arrest violates the scope limitations of the Fourth Amendment. The Fourth Amendment limits the scope of detention for suspects who are not under arrest. *See Terry v. Ohio*, 392 U.S. 1 (1968). Although parties dispute whether Defendant was under arrest when police transported him to the Glenwood residence, whether a defendant was "in custody" is a mixed question of fact and law, so we review the issue *de novo. Thompson v.*

*Keohane*, 516 U.S. 99, 112 (1995). Two discrete inquiries are essential to the determination of whether a defendant is in custody: first, what were the circumstances surrounding the detention; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. *Thompson*, 516 U.S. at 112. Here, Defendant was in handcuffs, placed in a police car, and transported. A reasonable person would not have felt free to leave. Defendant was in custody and the police properly detained him because they had probable cause to do so.

## C.

Third, Defendant argues that the police violated his *Miranda* rights by interrogating him without apprising him of his rights. Specifically, Defendant argues that the police interrogated him when they placed him in the inventory room while they executed the search at the Glenwood residence so that he was entitled to *Miranda* warnings. Suspects who are subject to a custodial interrogation are entitled to be apprised of their constitutional rights. *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998).

Defendant relies on *Combs v. Wingo*, 465 F.2d 96 (6th Cir. 1972) to stand for the proposition that placing him in the inventory room constituted an improper interrogation. However, the facts of *Combs* are different from the facts here. In *Combs*, a murder suspect self-surrendered to the police. *Id* at 97. An officer *Mirandized* the defendant and asked him if he would like to make a statement. *Id*. The defendant said he would like to make a statement, but that he would like to speak to an attorney first. *Id*. The officer then proceeded to show him the ballistics report from the murder. *Id* at 98.

*Combs* does not stand for the proposition that merely placing a defendant in an inventory room during a search constitutes a functional interrogation. In *Combs*, the police

also admitted to showing the defendant the ballistics report in order to break down the defendant's will and elicit a confession.

Although Defendant argues that the police *could* have placed him somewhere else during the search, that is different from arguing that eliciting an incriminating statement was the *only* possible reason for keeping him in the inventory room. In fact, an officer testified that keeping detainees in the inventory room was the usual procedure. Because the police did not interrogate Defendant by placing him in the inventory room, he was not entitled to *Miranda* warnings.

Defendant also argues that Officer Lees violated Defendant's *Miranda* rights by engaging in tactics that the Supreme Court recognizes as functional interrogation. First, Defendant relies on *United States v. Soto*, 953 F.2d 263 (6th Cir. 1992) to argue that Lees' positing Defendant's guilt as a fact violated *Miranda*. Lees, however, testified that he told Defendant that he preferred that Defendant remain silent. Lees further testified that he only spoke to Defendant during the five to ten minute ride to respond to Defendant's questions and that Defendant made several voluntary statements. Next, Defendant argues that Lees improperly removed him from the house and his girlfriend. However, Lees testified that he removed Defendant from the house because he had become loud and belligerent.

Courts do not hold police accountable for the unforeseeable results of their words or actions. *Rhode Island v. Innis*, 446 U.S. 291, 301–02 (1980). The definition of interrogation, therefore, only extends to words or actions on the part of officers that they should have known were reasonably likely to elicit an incriminating response. *Id.* Officer Lees was not the investigator on this case. He explained that he was transporting Defendant to finalize paperwork for the arrest and not for questioning. He responded to Defendant's questions

during a short car ride without asking him any questions. Lees is not accountable for Defendant's incriminating responses because they were voluntary except for the statement properly excluded by the district court.

**D.**

Fourth, Defendant argues that Agent Hunneyman's trial testimony about gang violence was irrelevant and unduly prejudicial to Defendant. This Court reviews evidentiary rulings to which there was no objection for plain error. Plain error is established upon showing that there was an error, that it is obvious, that if affected Defendant's substantial rights, and that it seriously affects the fairness or integrity of judicial proceedings. *United States v. Barnett*, 398 F.3d 516, 525–27 (6th Cir. 2005).

Agent Hunneyman testified that he became familiar with Defendant as a result of investigating violent gang activity. Without any objection from Defendant, the district court *sua sponte* instructed the jury that Defendant was not charged with any violent crimes and that the case was not about a violent crime.

To satisfy the substantial rights prong of plain error review, "the defendant must make a specific showing of prejudice." *United States v. Fraser,* 448 F.3d 833, 842 (6th Cir. 2006). Defendant argues that his substantial rights were affected because testimony alleging gang affliation prejudiced the jury. Indeed, Honeyman's testimony was improperly before the jury. The error is not reversible, however, because there is evidence sufficient to overcome any prejudice to convict Defendant. Defendant has, therefore, failed to show that his substantial rights were affected.

**E.**

Lastly, Defendant argues that the district court violated his Sixth Amendment rights when it applied an enhanced mandatory minimum sentence without submitting the fact of his prior conviction to a jury. Because Defendant did not raise this argument before the district court, we review his Sixth Amendment argument under a plain error standard. *United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008)

In *Alleyne v. United States*, 133 S. Ct. 2151 (2013), the Court held that any fact—other than that of a prior conviction—that increases a mandatory minimum sentence is an element that must be submitted to a jury and found beyond a reasonable doubt.  However, *Alleyne* did not overrule *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), which held that a judge may find, based on a preponderance of evidence, the fact of a prior conviction. This Court recently held that it must apply *Almendarez-Torres* until the Supreme Court overrules it. *See United States v. Nagy*, 760 F.3d 485, 488–89 (6th Cir. 2014).  Consequently, we are bound to hold that the district court did not commit plain error when it made a judicial finding that a preponderance of the evidence supported enhancing Defendant's mandatory minimum sentence.

For the foregoing reasons, we AFFIRM Defendant's conviction and sentence.