UNITED STATES of America

v.

### Esmeralda MARTINEZ and Edna Rivera

No. 1–04–00018.

United States District Court, M.D. Tennessee, Columbia Division.

Feb. 2, 2005.

James Gabriel Banks, Office of the United States Attorney, Nashville, TN, for U.S. Attorneys.

Carl Douglas Thoresen, Federal Public Defender's Office, Nashville, TN, for Esmeralda Martinez (1), defendant.

William Billington Bruce, Bruce, Weathers, Corley & Lyle, Nashville, TN, for Edna Rivera (2), defendant.

## MEMORANDUM

HIGGINS, District Judge.

The Court has before it the motion (filed November 29, 2004; Docket Entry No. 38) of the defendant, Esmeralda Martinez, to suppress, and her memorandum (Docket Entry No. 39) in support; the government's response (filed November 24, 2004; Docket Entry No. 35); and the motion (filed December 2, 2004; Docket Entry No. 44) of the defendant, Edna Rivera, to

join in Ms. Martinez's motion (Docket Entry No. 38) to suppress.

A hearing was held on the defendants' motions from December 6, 2004, to December 8, 2004. For the reasons stated below, the defendants' motions shall be granted.

I.

On July 30, 2004, the defendants, Esmeralda Martinez and Edna Rivera, were traveling eastbound on Interstate 40 through Hickman County, Tennessee. Ms. Martinez, the driver, and Ms. Rivera, the passenger and niece of Ms. Martinez, were traveling in a green Chevrolet, extended-cab pickup truck. Also, in the truck were Ms. Martinez's daughter, age seven, and Ms. Rivera's two daughters, then ages twelve or thirteen and five. Both of the defendants are of Hispanic descent.

Special Agent Darryl Shane Fisher of the 21st Judicial Drug Task Force testified that the defendants were traveling in the right hand lane at approximately 6:00 a.m. when he observed their truck swerve into the left hand lane and almost hit a tractor trailer. At the time, Agent Fisher was parked in the median at the 155 mile marker. He testified that what drew his attention to the defendants was the sound of a vehicle driving over the "rumble strips" on the shoulder of the road. When he looked to the direction of the noise, he saw the tractor trailer partly driving on the left hand shoulder and the defendants' truck straddling both lanes of the interstate. He activated his lights and pulled Ms. Martinez over at the 158 mile marker in Hickman County for reckless driving. He also pulled her over for failure to have a properly illuminated registration plate.

After stopping the vehicle, Agent Fisher approached on the passenger's side of the vehicle. Ms. Rivera was riding in the front passenger's seat, and the three children were in the back seats. The traffic stop was captured on videotape from the mounted camera in the agent's patrol car. *See* government's Exhibit No. 1, videotape of stop.

Agent Fisher asked to see Ms. Martinez's driver's license. He then asked her to exit the vehicle and explained to her one of the reasons why he pulled her over, showing her the poorly illuminated license plate. He testified that the reason he elected to address the license plate first was to keep the confrontation level down. He explained that by allowing a driver to physically see the reason for why she was stopped helps to ease the confrontational aspect of the situation.

Ms. Martinez stated that they were traveling from Seguin, Texas, to Toledo, Ohio, to visit her sister who lived there and were planning to stay there about a week. She also stated that the vehicle belonged to her and that although she had it for three or four weeks she had not yet changed the vehicle registration to her name. According to her, she had purchased the truck from a friend from Rio Grande City, Texas. The license tags were to expire the next day.

Agent Fisher told Ms. Martinez to wait at the front of his patrol car as he went to ask Ms. Rivera for her license and see the truck's registration papers. When asked why they were traveling to Toledo, the defendant, who was eight months pregnant at the time, responded that they were going to a baby shower party. She also stated that they were planning on being in Toledo for one or two weeks. Agent Fisher then returned to his patrol car to run a license and registration check. He radioed Blue Light Operation Center located in Gulfport, Mississippi, with the information and then called Agent Timothy Hawn for assistance. He informed Agent Hawn that he was planning "to run Heidi," indicating that he was going to run his trained drug

detection dog around the exterior of the truck.

Agent Fisher then exited his vehicle and, while waiting on the results of the license and registration checks, informed Ms. Martinez of the second reason for stopping her. He told her that he did not know if she was falling asleep or if she was watching him but she almost swerved into a tractor trailer. From the videotape, she neither disputes nor accedes to this observation.

Agent Fisher testified that during the traffic stop he made several observations, which he deemed to be "indicators" of suspicious activity. These indicators were as follows: (1) there was only one duffle bag in the truck, although there were five occupants who purportedly were to be in Toledo for one or two weeks; (2) the key in the ignition was the only key on the key ring, ostensibly indicating that the driver was not the personal owner of the truck; (3) ostentatious display of religious paraphernalia inside of the truck in an attempt to create the impression of a law abiding citizen; (4) Ms. Rivera's artery in her neck was pulsating as an indicator of nervousness; (5) the defendants' stories were slightly different in that Ms. Martinez stated they were going to be gone for one week while Ms. Rivera stated they were going to be gone one or two weeks; and (6) Ms. Martinez said the truck ran smoothly while according to Agent Fisher the motor sounded rough. He testified that these indicators, considered individually, would not be suspicious but taken together were cause for suspicion of possible illegal activity.

Accordingly, based on these observations Agent Fisher inquired if there were any weapons, money or drugs in the truck. Ms. Martinez responded "no" to these questions. He then asked her for consent to search the truck, and she assented. He provided her with a written consent form which she signed and stated that she understood its contents.[1]

After obtaining consent to search the vehicle, Agent Fisher had Ms. Rivera and the three children exit the vehicle. Agent Hawn arrived on the scene and began to help Agent Fisher with the search of the vehicle. The agents subsequently discovered six packages of cocaine hidden inside the batteries of the truck. Agent Fisher advised the defendants of their rights. He asked them if they understood their rights, and they both responded "yes." He then placed them under arrest. He testified that he did not issue Ms. Martinez a ticket for the alleged traffic violations because he was more concerned with the drug offense.

Agent Fisher transported Ms. Rivera and her two children to the Hickman County Sheriff's Department while Agent Hawn transported Ms. Martinez and her child. The Department of Child Services was called, and it was determined that representatives from that department would meet the agents at the county jail. However, there was a misunderstanding between the parties as the agents believed that representatives from DCS would meet them at the jail while the DCS members were under the belief that the agents would call them once they arrived at the jail. As a result, members from DCS did not arrive at the jail until approximately 9:47 a.m., roughly three and a half hours after the occupants were initially stopped.

Ms. Rivera was interviewed by two agents from DCS, and Ms. Martinez was interviewed by a third DCS agent. The interview was conducted in a small room at the jail. Present in the room were the defendants, Agent Fisher, Agent Hawn, a magistrate who had come to the jail to

---

1. The government did not submit the written consent form as an exhibit.

issue arrest warrants and the three DCS agents. One of the DCS agents, Stephanie Dunn, asked Ms. Rivera if she was under the influence of drugs, and she responded "no." Ms. Dunn then asked if she was just carrying drugs for somebody, and Ms. Rivera responded "yes." Agent Fisher standing in the doorway overheard this admission. Agent Fisher testified that following this interview he spoke briefly with Ms. Dunn outside of the jail and confirmed that Ms. Rivera had admitted to transporting the drugs.

The defendants are charged in the indictment with possession with intent to distribute five kilograms of cocaine in violation of Title 21, United States Code, Section 841(a)(1) and aiding and abetting, in violation of Title 18, United States Code, Section 2.

The defendants contend that under the Fourth Amendment to the United States Constitution the evidence discovered should be suppressed because it was discovered as a result of an unlawful stop and detention. Specifically, the defendants contend that the stop was not based on probable cause and that the duration of the detention was excessive and no reasonable suspicion developed during the detention justifying its prolongation. Ms. Rivera asserts that she has standing to contest the stop and detention.

## II.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Supreme Court of the United States has found that the stop of an automobile and the temporary detention of individuals during the stop, "even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct.

1769, 1772, 135 L.Ed.2d 89, 95 (1996) (citations omitted). The Court explained that an automobile stop constitutes a seizure under the Fourth Amendment because it "significantly curtails the freedom of action of the driver and the passengers, if any, of the detained vehicle." *Berkemer v. McCarty*, 468 U.S. 420, 436, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317, 332 (1984).

 In determining whether an automobile stop is constitutional, the Court must conduct a fact specific inquiry which turns upon whether the stop is reasonable under the circumstances. *Id.* Where the police have probable cause to believe that a traffic violation has occurred, the Supreme Court has found that the decision to stop an automobile is reasonable. *See Delaware v. Prouse*, 440 U.S. 648, 659, 99 S.Ct. 1391, 1399, 59 L.Ed.2d 660, 667 (1979); *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331, 336 (1977) (per curiam). The United States Court of Appeals for the Sixth Circuit in *United States v. Ferguson*, 8 F.3d 385 (6th Cir.1993) (en banc), *cert. denied*, 513 U.S. 828, 115 S.Ct. 97, 130 L.Ed.2d 47 (1994), stated that the police could reasonably stop a vehicle for any traffic violation, no matter how slight and no matter whether the hope of finding contraband as the result of the stop was the officer's subjective motivation for making the stop. However, the reasonableness of the stop "is ascertained by determining first 'whether the officer's action was justified at its inception,' and second 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir.2000) (citing *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 904–05 (1968)).

 Moreover, the Fourth Amendment has been interpreted as permitting a law enforcement officer to "briefly detain a

person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot' even if the officer lacks probable cause." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889, 911 (1968)). When the detention is preceded by a traffic stop, after the original purpose for the stop is complete, the officer cannot "further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *United States v. Mesa,* 62 F.3d 159, 162 (6th Cir.1995); *United States v. Hill,* 195 F.3d 258, 264 (6th Cir.1999). Whether the officer has such a reasonable, articulable suspicion is determined based upon the "totality of the circumstances." *United States v. Erwin,* 155 F.3d 818, 822 (6th Cir.1998) (citations omitted). That is, the Court "must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Smith,* 263 F.3d 571, 588 (6th Cir.2001). " 'Reasonable suspicion' is more than an ill-defined hunch; it must be based upon a 'particularized and objective basis for suspecting the particular person ... of criminal activity.' " *Houston v. Clark County Sheriff Deputy John Does 1–5,* 174 F.3d 809, 813 (6th Cir.1999) (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981)). A Court must take a common sense approach and remain mindful of the fact that "the evidence ... collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those in the field of law enforcement." *Cortez,* 449 U.S. at 417–18, 101 S.Ct. at 695, 66 L.E.2d at 629; *Smith,* 263 F.3d at 588.

## III.

### A. STANDING

As an initial matter, the Court shall briefly address whether Ms. Rivera has "standing" to contest the stop of the vehicle and her subsequent detention.

■ The Supreme Court has held that: Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.

*Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 425, 58 L.Ed.2d 387, 394–95 (1978) (citations omitted). Reasoning that with its long history of insisting that Fourth Amendment rights are personal in nature, the Supreme Court stated that the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Id.,* 439 U.S. at 140, 99 S.Ct. at 428, 58 L.Ed.2d at 399. Thus, the use of the term, "standing," is somewhat imprecise as the issue is more properly framed as whether the defendant had a "legitimate expectation of privacy" under the Fourth Amendment. *Id.,* 439 U.S. at 144, 99 S.Ct. at 431, 58 L.Ed.2d at 402. The defendant has the burden of establishing "standing" to assert a Fourth Amendment violation. *Smith,* 263 F.3d at 582.

Ms. Rivera concedes that as a passenger in the truck who did not have any property or possessory interest in it she did not

have a reasonable expectation of privacy to contest the search of the vehicle. *See United States v. Carter*, 14 F.3d 1150, 1154–55 (6th Cir.1994); *United States v. Pino*, 855 F.2d 357, 360–61 (6th Cir.1988); *United States v. Fowler*, No. 93–6483, 42 F.3d 1389, 1994 WL 685417, at *5 (6th Cir.1994). However, she does contend that she has standing to contest her stop and detention.

■■■ "[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of th[e] [Fourth] Amendment[ ], even though the purpose of the stop is limited and the resulting detention quite brief." *Prouse*, 440 U.S. at 653, 99 S.Ct. at 1396, 59 L.Ed.2d at 667. "[A] traffic stop significantly curtails the 'freedom of action' of the driver and the passengers, if any, of the detained vehicle." *Berkemer*, 468 U.S. at 436, 104 S.Ct. at 3148, 82 L.Ed.2d at 332. Therefore, because a passenger's own interests are affected by a seizure of his or her person, Ms. Rivera has standing to contest the stop of the truck and her subsequent detention. *Carter*, 14 F.3d at 1154 ("A passenger, like anyone else, obviously has a right not to be detained illegally."); *Fowler*, 42 F.3d 1389, 1994 WL 685417 at *4 ("Because defendant's person was seized, he clearly has standing to challenge the validity of the stop[.]").

The Court's next inquiry is whether the stop and/or detention of the defendants was unlawful. If so, the Court must then consider whether the subsequent search was tainted by the illegality in question. The Court will address the issue of whether the detention was unlawful first.

## B. DETENTION

The defendants contend that the stop was prolonged and exceeded the time necessary to accomplish the purpose of the stop. The defendants contend that their interrogation and the request for Ms. Rivera's identification prolonged the stop and was not reasonably related to the purpose of the stop. They assert that there did not exist a reasonable articulable suspicion that any of the occupants were engaged in illegal activity upon which to base their detention. They further assert that at no time during their detention did a reasonable articulable suspicion develop justifying their continued detention.

■■■ During a traffic stop, a law enforcement officer may order a driver to exit the vehicle. *Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331, 337 (1977) (per curiam). The officer can lawfully detain the driver of the vehicle "until after the officer has finished making record radio checks and issuing a citation, because this activity 'would be well within the bounds of the initial stop.' " *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir.1999) (citation omitted). The officer may lawfully question the driver about contraband and seek consent to search while these initial purposes are ongoing. *United States v. Palomino*, 100 F.3d 446, 449–50 (6th Cir.1996). Once the purpose of the initial stop is completed, the officer may not continue to detain a vehicle or its driver in the absence of reasonable suspicion of criminal activity warranting further investigation. *Mesa*, 62 F.3d at 162.

The evidence reveals that Agent Fisher was waiting for a records check on the defendants when he obtained consent from Ms. Martinez to search the vehicle and that he did not unlawfully prolong the defendants' detention beyond the purpose of the stop. Agent Fisher initially showed Ms. Martinez one of the reasons why he stopped her. He then discovered that she was driving a vehicle that was not registered to her. He testified that he became concerned that the vehicle might be stolen. As a result, he questioned Ms. Rivera as to her knowledge concerning the ownership

of the vehicle and requested to see her identification. After calling "BLOC," Agent Fisher informed Ms. Martinez of the second reason why he stopped her and then asked her if she was transporting any contraband. While waiting for a response from "BLOC," he then obtained her consent to search the vehicle. Thus, the reason for the stop had not concluded when Agent Fisher obtained consent to search the vehicle, and there is nothing to show that the defendants had been illegally detained up to that point.[2] *United States v. Garrido–Santana,* 360 F.3d 565, 574 (6th Cir.2004); *United States v. Burton,* 334 F.3d 514, 518–19 (6th Cir.2003).

■■■■ Where the prosecution relies on the consent of the defendant to justify a search, it bears the burden of proving by clear and convincing evidence that the consent was given freely and voluntarily. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854, 860 (1973); *United States v. French,* 974 F.2d 687, 693 (6th Cir.1992). Voluntariness of a consent to search is determined by the Court, based upon the totality of the circumstances. *Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59, 36 L.Ed.2d at 875; *United States v. Scott,* 578 F.2d 1186, 1189 (6th Cir.1978), *cert. denied,* 439 U.S. 870, 99 S.Ct. 201, 58 L.Ed.2d 182 (1978).

■■■■ In examining a consent, the Court must consider factors including "the age, intelligence, and education of the individual; whether the individual understands the right to refuse consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police." *United States v. Riascos–Suarez,* 73 F.3d 616, 625 (6th Cir. 1996). Based on the evidence before it, the Court finds nothing with respect to the characteristics of Ms. Martinez or the length of her detention that would render her consent invalid.

Accordingly, the Court finds that the defendants were not unlawfully detained. Therefore, the defendants' motions turn on whether Agent Fisher had probable cause to stop their vehicle.

## C. STOP

The government originally asserted that Agent Fisher had probable cause to stop the defendants because of an improperly illuminated license plate and reckless driving. In support of its position with respect to having an improperly illuminated license plate, the government cited Tennessee Code Annotated §§ 55–4–110[3] and 55–9–404.[4] However, at the suppression hear-

---

2. The Court notes that absent Ms. Martinez's consent to search Agent Fisher would not have had reasonable suspicion to prolong the defendants' detention based solely on the six "indicators" of suspicious activity to which he testified. However, because he obtained Ms. Martinez's consent, the issue of the sufficiency of these "indicators" establishing an articulable reasonable suspicion of criminal activity is moot.

3. That statute provides, in relevant part:
 Every registration plate shall at all times be securely fastened in a horizontal position to the vehicle for which it is issued so to prevent the plate from swinging and at a height of not less than twelve inches (12")

from the ground, measuring from the bottom of such plate, in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible. No tinted materials may be placed over a license plate even if the information upon such license plate is not concealed.
Tenn.Code Ann. § 55–4–110(b).

4. That statute provides, in relevant part:
 Every motor vehicle and every trailer or semitrailer which is being drawn at the end of a train of vehicles shall carry at the rear a lamp of a type which exhibits a yellow or red light plainly visible under normal atmospheric conditions from a distance of five

ing the government abandoned the allegation of an improperly illuminated license plate as grounds for stopping the defendants.[5] Thus, the government relies only on the allegation of reckless driving[6] as providing probable cause for the stop. The defendants contend that Ms. Martinez did not commit a traffic infraction warranting probable cause to stop their vehicle and challenge Agent Fisher's credibility in making the initial stop.

The law is well-settled that pretextual traffic stops are permissible. *Whren,* 517 U.S. at 812–13, 116 S.Ct. at 1774, 135 L.Ed.2d at 97; *Arkansas v. Sullivan,* 532 U.S. 769, 121 S.Ct. 1876, 149 L.Ed.2d 994 (2001); *Hill,* 195 F.3d at 264. "That is to say, an officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle." *Hill,* 195 F.3d at 264.

In an attempt to discredit Agent Fisher concerning the stop, the defendants presented, among other things, the notes and a narrative statement typed by Ms. Dunn of the conversation she had with Agent Fisher on July 30, 2004.[7] *See* Defendants' Exhibit Nos. 1 and 2. In her notes, which were made on or about July 30, 2004, Ms. Dunn wrote, in part:

> hundred feet (500′) to the rear of such vehicle, and such light shall be so constructed and placed that the number plate carried on the rear of such vehicle shall under like conditions be so illuminated by a white light as to be read from a distance of fifty feet (50′) to the rear of such vehicle. Tenn.Code Ann. § 55–9–404(a).

5. The Court notes that Tenn.Code Ann. § 55–9–404 would have been inapplicable because effective April 8, 2004, it was amended by the addition of subsection (b), which states, "[T]his section shall not apply to a single motor vehicle … but shall only apply to the last motor vehicle being drawn at the end of a train or group of motor vehicles."

CM talked w/ Agent Fisher outside of the jail about the traffic stop. Agent Fisher said that they watch vehicles from Texas b/c it is one of the major drug ports. Agt. Fisher also said that he questioned them about the amt. of cocaine they were carrying. Agt. Fisher explained that Martinez/Rivera were in possession of 6 kilos of cocaine. Agt. Fisher told CM that Martinez/Rivera reported to him that both she and Rivera would each receive $5,000 each if they delivered the cocaine. CM asked where the cocaine was located at. Agent Fisher reported they found the cocaine located in the battery casing and he noted that it was only under very close inspection of the vehicle that they were able to notice the battery cable was not exactly right on the battery. Agt. Fisher said that he and Agent Hawn felt that there must be men involved b/c most women would not know that a vehicle will run off of the alternator. Once it was started, the vehicle would not require the battery to run the vehicle.

CM went back inside introduced and asked Ms. Rivera for some info about her children.

*Id.,* Exhibit No. 1.

On December 3, 2004, at the request of the assistant United States attorney, Ms.

6. Tenn.Code Ann. § 55–10–205(a) provides, "Any person who drives any vehicle in willful or wanton disregard for the safety of persons or property commits reckless driving."

7. In fact a large part of the evidence, outside of contesting the basis for the stop, was an indictment of the practices, procedures and routine of the 21st Judicial Drug Task Force. The Court allowed the defendants to present such evidence for purposes of making their record. While relevant in part, the Court does not substantially rely on it in reaching its determination regarding the stop.

Dunn typed a narrative statement comprised of the notes she made on or about July 30, 2004, and her independent recollection of her conversations with agent Fisher and Ms. Rivera at the Hickman County Jail. That statement states, in part:

CM arrived at the Hickman County Jail, between 9:00 and 9:30 a.m. Upon arrival, CM went inside the jail and introduced myself and explained that myself and the other two people with CM were representatives of the Department of Children's Services. CM initially asked Ms. Rivera for the reason that she was at the Jail with her minor children. She said that they were arrested for possession of cocaine. After explaining the reason for our presence there on this date, CM excused herself to go outside the jail to speak with the Drug Task Force Agents.

CM spoke with Agent Fisher outside the jail and asked him to explain what had happened for CM's understanding. Agent Fisher said that he and Agent Hawn had made a routine traffic stop and asked permission to search for drugs. CM asked why they picked this vehicle to search. Fisher said that they (DTF) watch vehicles that come from Texas as it is recognized as one of the larger ports where cocaine and other drugs are brought into the United States. Fisher went on to say that they had to carefully go over the vehicle and noted that they found the cocaine in the battery casing under the hood. He said that they had to carefully inspect the vehicle and happened to notice that one of the battery cables were not just exactly right on the battery. He said that they discovered the cocaine. CM asked how much cocaine they seized. He explained that they found six kilograms. Fisher went on to say that he and Agent Hawn feel that these ladies were not in this drug smuggling alone b/c most women would not know that the battery

is not required once a vehicle is running. He said that if the vehicle is running, the alternator would run the vehicle. He also said that Martinez and Rivera told them that they were each promised to be paid the amount of $5000.00 if they would deliver the cocaine. He went on to talk about this was significant b/c neither Martinez nor Rivera were working at this time. CM asked why would Martinez and Rivera put their children in harm's way for a drug delivery. Agent Fisher said that it was only for a cover so no one would stop these two females. He also informed CM that Ms. Rivera reported to be eight months pregnant. CM asked if Fisher knew where these ladies were headed with the cocaine. Fisher reported that they informed him that they were on their way to a baby shower in Ohio. . . .

CM then went back into the jail and began to gather the necessary information to fill out the custody packets for placement of the children. CM interviewed Ms. Rivera at this time about her two children . . . . CM was concerned about Ms. Rivera being pregnant and questioned as to whether she was using the cocaine or if she was just delivering the drugs. Ms. Rivera said that she was just delivering the drugs, and denied using any type of drugs. She did not report to CM that she was receiving any type of payment for the delivery. Ms. Rivera would not comment further about her reasoning for having cocaine in her possession while her children were there. During the time that CM was interviewing about this, Ms. Martinez was trying to talk to Ms. Rivera across the room. CM did not understand what was said as it was spoken in Spanish. This went on the entire time that CM was gathering the information. . . .

*Id.,* Exhibit No. 2.

Agent Fisher testified that he could not recall everything that was said during his

conversation with Ms. Dunn except for the fact that she confirmed that Ms. Rivera admitted to transporting the drugs. However, he denied telling Ms. Dunn that the defendants told him they were to receive $5,000 each for transporting the drugs. He testified that he would have included that information in his report if they had. When asked on cross examination if he told Ms. Dunn that he targets vehicles coming out of Texas because it is a large port for drugs, he stated that he did not remember. He added that he was not particularly concerned with Texas. Later, when asked again whether he made the statement regarding targeting cars with Texas plates, Agent Fisher reiterated that he did not remember making such a statement and added that he personally would not make that type of statement. However, Ms. Dunn testified definitively that Agent Fisher told her that the defendants were to receive $5,000 each for transporting the drugs and that the Drug Task Force watches for vehicles bearing Texas license plates.

Agent Fisher was also questioned as to whether he was familiar with the phrase, "doing the drive." That phrase refers to when a law enforcement officer watches for a nervous reaction when a driver notices the officer's vehicle. In "doing the drive," an officer is looking for the reactions of a driver that would be different from that of the general public, presumably indicating possible nefarious activity by the driver. Agent Fisher testified that he does not employ such a tactic.

However, the defendants presented testimony from Russell B. Maybrey, Jr., a former assistant district attorney assigned to the 21st Judicial Drug Task Force, contradicting Agent Fisher's assertion. Mr. Maybrey testified that he rode on at least two occasions with Agent Fisher and observed Agent Fisher "doing the drive." He testified that Agent Fisher would look for a driver's reaction and would then look to see if the vehicle had an out of state license plate. He testified that Agent Fisher was especially interested in vehicles with Texas, California, New York and Arizona license plates.[8]

As has been stated, an officer's ulterior motive for stopping a defendant does not in itself constitute an impermissible stop. The reasonableness of the stop "is ascertained by determining first 'whether the officer's action was justified at its inception.'" *Freeman, supra*, (citing *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 904–05).

In *Hill*, the Sixth Circuit voiced its concern over the potential abuse by officers in stopping vehicles for any alleged traffic violation. The Court stated:

> We share in the concern that police officers are using the state of the law in this Circuit as carte blanche permission to stop and search "target" or "profile" vehicles for drugs. Of course, the Supreme Court in *Whren* confirmed that a police officer is legally allowed to stop a vehicle for a traffic violation when there is probable cause for the traffic stop, without regard for the officer's subjective motivation. However, we agree that it is the responsibility of the courts to make sure that police officers act

---

**8.** Statistical evidence was heard with regard to vehicles with foreign license plates that were stopped by Agent Fisher from January, 2003 to March, 2004. Defendants' Exhibit Nos. 7–12. Rarely were tickets for traffic violations issued during such stops. Similarly, Agent Fisher did not issue a traffic ticket to Ms. Martinez, ostensibly because he discover-

ed the presence of drugs, which was the more serious offense. His job is solely to interdict the flow of illegal drugs and not write traffic tickets. Agent Fisher basically acknowledged this fact. This, of course, is perfectly permissible under *Whren* as long as an officer has an objective basis for stopping a defendant.

appropriately and not abuse the power legally afforded to them by, among other things, carefully scrutinizing a police officer's testimony as to the purpose of the initial traffic stop.

195 F.3d at 267.

■ Mindful of the concerns articulated by the Sixth Circuit in *Hill,* the Court finds that the stop of the defendants' vehicle was unreasonable at its inception. The Court finds Ms. Dunn's testimony to be very credible. In contrast, the Court finds that Agent Fisher's testimony with regard to the stop is not credible. The Court simply cannot reconcile the testimony of Agent Fisher with that of Ms. Dunn's and the documentation which she provided. Ms. Dunn clearly received this information from Agent Fisher. Therefore, the Court is convinced that Agent Fisher plainly lied in denying the documented testimony of Ms. Dunn.

The government argues that if the defendants had told him that they were to receive $5,000 for transporting the drugs then Agent Fisher would have surely testified to this fact as it would establish proof of the defendants' knowledge. The Court disagrees. Agent Fisher may have not wanted to vary his testimony from that which he gave at the suppression hearing held on November 22, 2004, concerning Ms. Rivera's initial motion (filed November 3, 2004; Docket Entry No. 27) to suppress, where he made no mention of the $5,000.

Moreover, he may not have wanted to provide this information as it was coupled with his statement concerning how the Drug Task Force watches for vehicles with Texas license plates because Texas is a large port of entry for drugs. Whatever the reason, Ms. Dunn certainly has no motive to fabricate such a statement.[9]

The government next argues that Ms. Dunn's typed narrative statement, as well as her testimony, reflect that she asked Agent Fisher why he chose to *search* the defendants' vehicle as opposed to why he chose to *stop* their vehicle. The Court finds this is a distinction without a difference. A vehicle must first be stopped in order to be searched. The whole purpose of *stopping a profile vehicle is to either develop probable cause or obtain consent to search the vehicle. The fact that she may have* inquired into why the defendants' vehicle was searched instead of stopped is of no practical significance.

The government also argues that from the videotape it appears that Ms. Martinez agrees with Agent Fisher's assessment as to her almost swerving into the tractor trailer as justification for stopping her. The videotape reveals the following exchange:

> Agent Fisher: Another reason, the reason I asked if you've been driving a while, I think you may have been watching me or something out of your

___

**9.** To be sure, Ms. Dunn did have some misrecollection of the sequence of events. For instance Ms. Dunn was unsure when Ms. Rivera admitted to transporting the drugs but believed it was after she had spoken with Agent Fisher outside the jail. She also believed that she arrived at the jail between 9:00 to 9:30 a.m. The video taken from Agent Fisher's patrol car clearly shows that Ms. Dunn arrived at the jail at 9:46 a.m. The videotape also supports the position that Ms. Dunn spoke to Agent Fisher outside of the jail at 10:56 a.m., which she concedes would indi-

cate that she spoke to Agent Fisher after she had conducted her interview with the defendants. Moreover, in her typed narrative statement Ms. Dunn incorrectly reported that the defendants were from El Paso, Texas. However, she readily testified that she inadvertently included that information because of a case on which she was recently working. While there may have been some discrepancies, the Court finds that they are minor and do not result from an intentional falsehood on her part.

mirror. If you're not sleepy, if that's not the case-

Ms. Martinez: No, I-

Agent Fisher: You about got into the side of a truck, a big tractor trailer, and he had to swerve out. Do you hear these rumble strips, he had to swerve out over in the slow lane, you were over in the slow lane, I think you may have been watching me, and he was trying to come around you because you were going slow.

Ms. Martinez: Oh. Okay.

Agent Fisher: And he went outside of there bounds and I said, oh man, she's either falling asleep or something's going on.

Ms. Martinez: We didn't want to wreck so we were going slower.

Transcript (filed December 6, 2004; Docket Entry No. 54) of videotape at 8–9.

Viewing the videotape, the Court finds that while Ms. Martinez does not dispute the agent's statements she neither concedes nor acquiesces to them. She merely states, "Oh. Okay," seemingly in reference to his statement regarding her speed. She makes no statements in regard to the alleged swerving but instead only states, in response to Agent Fisher's comments about her either being tired or watching him and driving slowly, that they "didn't want to wreck so [they] were going slower." *Id.* The Court does not adopt the government's interpretation of Ms. Martinez's body language or silence as proof of Agent Fisher's putative reason for stopping the defendants. The Court finds that the videotape is simply not clear on this point.

The Court also notes that Agent Fisher's statements regarding Ms. Martinez watching him is consistent with the evidence that was heard concerning the technique of "doing the drive," which he denied employing. Agent Fisher testified that what drew his attention to the defendants

was the sound of the tractor trailer driving over the rumble strips. However, he explained to Ms. Martinez that she was going too slowly, and the tractor trailer tried to pass her. He then mentioned that he thought she was watching him. The Court finds these statements revealing and consistent with an officer "doing the drive," and go further to undermining Agent Fisher's credibility.

The Court notes that Agent Fisher's credibility has been questioned by at least one other court in this district. In *United States v. Walton,* No. 1:03–00014 (M.D.Tenn.2004), the defendant, Alvin Jerome Walton, filed a motion to suppress the evidence seized as a result of a traffic stop by Agent Fisher. In that case, the defendant, with Texas tags, was stopped while traveling eastbound on Interstate 40 for following a tractor trailer too closely and for the license plate not being clearly visible due to the dealer's tag covering part of the plate. Memorandum (entered November 12, 2004; Docket Entry No. 51; No. 1:03–00014). Agent Fisher ran a license and registration check on the defendant through BLOC.

According to Agent Fisher, he received information from BLOC that the defendant had been arrested for conspiracy to distribute cocaine, other seizures had been connected to the defendant, and he was usually armed. *Id.* at 4. He testified that at that time the dispatcher did not inform him that the defendant's license and registration had come up clear. However, BLOC call records indicated that the only information available to the dispatcher during that call was that the defendant's license and registration were clear. *Id.* at 4–5. Although the defendant's motion was ultimately denied, The Honorable Robert L. Echols did not credit Agent Fisher's testimony and found that the BLOC dispatcher only informed Officer Fisher that

the defendant's driver's license and registration were clear. *Id.* at 5, 12.

The Court also finds it significant that the government in mid-hearing abandoned its reliance on an improperly illuminated license plate as one of the reasons for stopping the defendants. From the videotape, it is apparent that there was plenty of daylight. Agent Fisher's initial assertion of this reason as grounds for the stop further undermines his credibility.

The Court has had two occasions in this case to observe the appearance and demeanor of agent Fisher and is convinced that he is not worthy of belief with regard to the circumstances leading to the stop of the defendants. The Court does not believe Agent Fisher's testimony about the movement of the defendants' vehicle across the white line. The Court is also convinced Agent Fisher fabricated this story to justify the stop.

As it is the responsibility of the courts "to make sure that police officers act appropriately and not abuse the power legally afforded to them by, among other things, carefully scrutinizing a police officer's testimony as to the purpose of the initial traffic stop," *Hill,* 195 F.3d at 267, the Court finds that the stop of the defendants was unreasonable at its inception. The Court cannot reconcile certain inconsistencies in Agent Fisher's testimony with other evidence in the record. Facing such inconsistencies, the Court cannot help but apply the maxim, *falsus in uno, falsus in omnibus* (false in one thing, false in everything) to his testimony. Accordingly, the Court finds that the stop of the defendants' vehicle violated their Fourth Amendment right to be free from unreasonable seizures as Agent Fisher did not have probable cause to believe that a traffic violation had been committed.

## D. FRUIT OF THE POISONOUS TREE

■ Evidence seized as the result of an unconstitutional search is the fruit of the poisonous tree and may not be used as proof against the victim of the search. *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). Of course, such evidence is not automatically subject to suppression under the exclusionary rule. *Brown v. Illinois,* 422 U.S. 590, 600, 95 S.Ct. 2254, 2260, 45 L.Ed.2d 416, 425 (1975). A court must decide "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455 (1963) (quotation omitted). The government has the burden to show that the evidence seized is not the fruit of the poisonous tree. *United States v. Twilley,* 222 F.3d 1092, 1097 (9th Cir. 2000). The taint of illegality may be purged if the evidence would have been inevitably discovered absent a connection to the underlying illegality, *Nix v. Williams,* 467 U.S. 431, 448, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377, 390 (1984), if it were discovered by an independent source, or if the discovery of the evidence has " 'become so attenuated as to dissipate the taint.' " *Wong Sun,* 371 U.S. at 487, 83 S.Ct. at 417, 9 L.Ed.2d at 455 (citation omitted).

■ The government has not shown nor does it argue that the discovery of the drugs in the batteries was sufficiently attenuated to dissipate the taint caused by the illegal traffic stop or that the contraband was discovered by an independent source. The interrogation of the defendants and conduct of the search were a direct result of the unlawful traffic stop.

*Twilley*, 222 F.3d at 1097. Accordingly, the ensuing search of the vehicle violated the defendants' Fourth Amendment rights. Therefore, the Court concludes that the evidence seized shall be suppressed.

An appropriate order shall be entered.

### ORDER

In accordance with the memorandum contemporaneously entered, the motion (filed November 29, 2004; Docket Entry No. 38) of the defendant, Esmeralda Martinez, to suppress, and the motion (filed December 2, 2004; Docket Entry No. 44) of the defendant, Edna Rivera, to join in Ms. Martinez's motion (Docket Entry No. 38) to suppress are granted.

It is so ORDERED.