IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 26, 2006

## STATE OF TENNESSEE v. ROBERT LEE HAMMONDS

**Direct Appeal from the Criminal Court for Sumner County**
**No. 347-2003     Jane Wheatcraft, Judge**

---

**No. M2005-01352-CCA-R3-CD - Filed November 29, 2006**

---

The Defendant, Robert Lee Hammonds, pled guilty to possession of over 26 grams of cocaine. Pursuant to Tennessee Rule of Criminal Procedure 37, the Defendant reserved four certified questions of law relating to whether the trial court erred when it denied his motion to suppress because the traffic stop and subsequent search were unconstitutional. He contends that the officer exceeded the scope of the stop and that the mandatory blanket consent form that he signed as part of a previous community corrections sentence did not give the arresting officer consent to search his vehicle. Further, he contends that he revoked any consent given by the mandatory blanket consent. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID G. HAYES and J.C. MCLIN, JJ., joined.

Paul Walwyn, Madison, Tennessee for the appellant, Robert Lee Hammonds.

Paul G. Summers, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Dee David Gay, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

This case arises from a traffic stop and subsequent search of the Defendant's vehicle that occurred on March 19, 2003. Prior to entering a guilty plea, the Defendant filed a motion to suppress the evidence against him, contending that it was the result of an illegal search and seizure. At the same hearing, the trial court heard this motion and allegations that the Defendant violated the terms of his community corrections sentence for a prior conviction. At the hearing, the following evidence

was presented: Cory Standridge testified that he is a community corrections officer, and he had reviewed the Defendant's file. He said that the Defendant was convicted for facilitation to sell over .5 grams of cocaine on January 23, 2003, and the Defendant received a three-year sentence. This sentence was to run consecutively to the Defendant's six-year sentence for possession of .5 grams or less of cocaine for resale. Accordingly, the Defendant was to serve a total of nine years on community corrections, beginning on January 28, 2003. Standridge testified that he reviewed the community corrections document, and the conditions that the document contained, with the Defendant. The Defendant signed that he had read the rules of community corrections and that he understood them. One of the conditions, Number 6, reads, "I will allow the probation officer to visit my home, employment site, or elsewhere at any time. My probation officer and/or any law enforcement officer has my consent to search my residence, automobile, personal belongings, or my person at any time without the necessity of a search warrant."

On cross-examination, Standridge testified that he read the community corrections document to the Defendant, and he asked if the Defendant had any questions. Standridge explained that a defendant must sign the document to be able to be on community corrections.

Joyce Turner, a case officer with community corrections, testified that she was the Defendant's community corrections officer. She said that two consecutive sentences, one for six years and one for three years, were to be served on community corrections. Turner prepared a community corrections violation warrant on March 20, 2003, on the grounds that the Defendant had been arrested for possession of cocaine for resale on March 19, 2003. Turner testified that, on March 19, 2003, she received a phone call from a drug task officer, Mike Guthrie, during which Officer Guthrie asked her if the Defendant was being supervised. The officer also asked her about the consent to search provision of the community corrections document, and Turner read the rule to him and then faxed a copy of the rule to the Officer Guthrie's office. Turner said that she had not had any problems supervising the Defendant until this time, and the Defendant had been complying with the requirements of community corrections. It was Turner's understanding that the Defendant was stopped on his way to see her at the community corrections office. On cross-examination, Turner said that she did not prepare the community corrections violation warrant until after she got confirmation that the Defendant had been arrested.

Jody Starks, an officer with the Gallatin Police Department, testified that he works with two other police officers, Mike Guthrie and Investigator Charles Campbell, doing criminal interdiction through traffic stops. On March 19, 2003, at around 1:00 p.m., Officer Starks was patrolling a zone with Officer Guthrie that is known to be the highest crime area in Sumner County, in part because it had a lot of drug activity including crack houses and dealers on the streets. The officer noticed a late-model, silver Expedition that had no visible registration on the truck. The officer pulled behind the truck and stopped it, and he could see the outline of what he believed to be a temporary tag but could not read the tag because of the tinted glass of the Expedition. The temporary tag was located in the upper, left-hand corner of the back glass that the officer could not see through. Officer Starks testified that this was a violation of Tennessee Code Annotated section 55-4-110, which states that "Every registration plate shall at all times be securely fastened . . . at a height of not less than 12

inches from the ground . . . in a place and position to be clearly visible . . . . No tinted materials may be placed over a license plate even if the information upon such license plate is not concealed."

Officer Starks testified that he activated the emergency equipment and the camera in his patrol car, and he approached the Expedition on the passenger side. The Defendant was the driver and the only occupant of the SUV. Officer Starks received the Defendant's driver's license and explained to the Defendant why he had been stopped. The officer and the Defendant discussed where the Defendant's temporary tag should be located and the Defendant's driving history, his criminal history, and the contents of the Defendant's truck. Officer Starks described the Defendant as "extremely nervous" when the Defendant reached into his glove box to get his paperwork. The officer also noticed that the Defendant's hands were shaking.

Officer Starks said that the Defendant told him that he was currently on probation for vandalism. The officer asked the Defendant if he had a prior gun charge, and the Defendant said that he did have such a charge in Nashville. Then the officer asked the Defendant if he had been arrested for drug possession, and the Defendant said yes and then admitted that he was on probation for the drug charges.

Officer Starks testified that, in the summer of 2002, he and Officer Guthrie had previously stopped a vehicle that was registered to and owned by the Defendant. He said that the vehicle was being driven by Anthony Branham, a known crack dealer, and that Demario Foster was a passenger. The officers seized crack cocaine from the vehicle. On another occasion, a few months later, Officer Starks stopped the Defendant, who was driving a gold Cadillac, for driving in inclement weather with no headlights on. At that time, the officer noticed that the Defendant was nervous, knew his reputation as a crack user, and knew that he had been previously arrested for drug possession. The officer requested permission to search the car, and the Defendant denied consent and was allowed to leave.

During the most recent stop, in March of 2003, the officer requested consent to search the truck, and the Defendant said that he did not understand why a search was necessary. The officer requested the name of the Defendant's probation officer, and he learned that it was Turner. He said that he recalled that there had been a change in the probation laws that required probationers to consent to searches of their person and vehicle when stopped by law enforcement. Officer Starks asked Officer Guthrie to call Turner and see if the Defendant had signed such a consent form. While Officer Guthrie made this call, Officer Starks wrote the defendant a warning and checked his driver's license. The officer learned that the Defendant had a valid driver's license and was not wanted in Sumner County. The officer then found out that the Defendant had, in fact, signed a consent to search provision in his probation agreement, so he conducted a pat-down search of the Defendant. During the pat-down the officer discovered drugs in the Defendant's pocket, and, after handcuffing the Defendant, the officer found six bags of crack cocaine in his pockets.

Subsequently, the officer arrested the Defendant and impounded his truck. After learning that the consent to search provision in the probation agreement covered the Defendant's residence,

the officers searched the Defendant's residences. In one of the residences, they found $6,000 in a purse, and, in a safe, they found a bag of crack cocaine, a bag of powder cocaine, digital scales with cocaine residue on them, and a book of checks listing the Defendant's name. In total, the officers found 100 grams of cocaine. In the Defendant's other residence, officers found two handguns. The Defendant admitted that he obtained the $6,000 in cash that was found by "[d]ealing."

On cross-examination, Officer Starks denied he treated everyone that he stopped in the high crime area as if they were a drug dealer. He agreed that after he initially stopped the Defendant and as he got nearer to the truck he could see the outline of the temporary tag but at no point was he able to see the tag to determine if it was still in date. The officer did not recognize the Defendant until he received the Defendant's driver's license and looked at the name and then looked at him more closely. Officer Starks said that he had reasonable suspicion based upon: the Defendant's location in the highest crime area in Sumner County, the Defendant's reputation as a drug dealer, and the fact that the Defendant was on probation for drug related crimes. The officer further said the Defendant was nervous, and, when he pulled over someone and they acted nervously, there were lots of illegal circumstances that he would be suspicious about from their nervous behavior.

Officer Starks testified that in his experience car dealers normally recommend that new car owners place the temporary tags in the upper left corner of the rear glass, and the Defendant's was placed in the upper left corner of the rear glass. He said that he did not know whether the tint on the Defendant's vehicle was legal, and he did not investigate this matter. The officer agreed that he asked the Defendant twice for permission to search the Defendant's truck, and he asked the Defendant the "theoretical" question of whether a dog would alert them to the presence of drugs.

After speaking with the Defendant's probation officer, Officer Starks testified that he inquired whether the Defendant had signed the consent to search provision in the probation agreement. He also inquired about whether the probation officer had to be present for them to conduct the search or whether they could go ahead and search the Defendant. The officer said that, at that point, he asked the Defendant to exit his SUV and told him that they were going to pat him down.

The officer testified about the previous occasion when he arrested two people for having drugs while they were in the Defendant's car. He agreed that the Defendant was not in the car, but he said that the vehicle was registered to the Defendant. The police seized the car, and the Defendant never came to claim the car.

On redirect examination, the officer said that the Defendant denied having drugs, guns, or any weapons in his truck, and he twice denied the officer consent to search.

The Defendant testified that he recalled being stopped on March 19, 2003, and he denied that he told police officers that the money that they had found was drug money. He recalled being stopped by the same officer in the Fall before this current stop, and he said that he answered all of the officer's questions and then asked why he was being asked all of these questions when he had

been pulled over for not having his headlights on. The officer told him, "I'm just trying to see who I'm dealing with," and then wrote him a warning and let him go. The Defendant said that when the officer pulled him over in March he told the officer, "We went through this once before," meaning that the officer already knew the answers to all of the questions that he was asking.

On cross-examination, the Defendant agreed that when he was stopped in the Fall he was not on probation for vandalism or for drug related charges. The Defendant conceded that he could have, in the six months between the two stops, gotten speeding tickets or that other circumstances may have changed. The Defendant agreed that he was convicted of facilitation to sell over .5 grams of cocaine and for possession of less than .5 grams of cocaine for resale, and he was sentenced to community corrections for both offenses. The Defendant agreed that on March 19, 2003, he was on his way to see his probation officer when the police discovered crack cocaine in his pockets. The Defendant denied that he was dealing cocaine that day or any day since he had been on probation.

Based upon this evidence, the trial court found:

The suppression motion is based on the facts, not the stop, because [defense counsel] stated earlier that they were not contesting the stop, only the subsequent search of the Defendant. The facts in brief form are this: The Defendant was in the highest crime area in Sumner County. It is zone 1. It has crack houses. The people on the street are dealing cocaine, and it is an area of Sumner County that we have had terrible, terrible problems with. He saw that -- "he" being the officer -- saw this truck that had no visible license plate. He couldn't see any visible registration. When he got behind it, he was able to see the outline only, and he was not able to read the numbers on the temporary tag . . . [because] of the window tint. He did acknowledge there was apparently a temporary tag in the window, but he could not read it. He believed this to be a violation of 55-4-110, so he activated his equipment[,] pulled the truck over[,] and the Defendant was the only occupant. He discussed with him why he had pulled him over. The Defendant was extremely nervous to the point where his hands were shaking. He admitted that he was on probation. He said at that time he was on probation for vandalism. The officer, being concerned for his own safety, asked him if he ever had any gun charges. He acknowledged that he did. And at some point, he acknowledged that he was also on probation for drugs. Once the officer received the license of the Defendant into the officer's hands, he recognized him. He said, "Oh, you're Robert Hammonds." He recognized him as a known drug dealer here in Sumner County.

He was highly suspicious because of, as he put it, where he was, the highest crime area in the county; who he was, a known drug dealer. He was currently on probation. He was extremely nervous, and he had had prior dealings with this [D]efendant.

Early or sometime in the summer of 2002, two other people who were driving

in the vehicle owned by this [D]efendant had been stopped and cocaine [had been] found on their person. And then shortly after that, in another vehicle owned by this [D]efendant, the car was stopped for no headlights, and again the Defendant was in the car. Denied the search, the consent to search, and the [officer] let him [go]. [In this case], however, the officer did call the probation officer; found out that he had signed some rules of probation. And the rule of probation number 6 states, "I will allow the probation officer to visit my home, employment site, or elsewhere at any time. My probation officer and/or any law enforcement officer has my consent to search my residence, automobile, personal belongings, or my person at any time without the necessity of a search warrant." The proof is uncontroverted that this [D]efendant was read these rules and that he signed them.

This, in my opinion, is an example of good cooperation between the probation department and the police. There is a move across this country toward community policing. Obviously, the police can't deal themselves with crime, and there has been a very real emphasis on community policing and cooperation between various agencies. We have worked toward that in Sumner County. A lot of our probation officers are even riding in police cars.

But the *Knights* case does say that if there is a reasonable suspicion and if the defendant has signed these rules of probation allowing a search that it is permissible.

People on probation do not have the same expectation of privacy that John Q. Public has, nor should they. They have already been -- these people have already been found guilty of violating the criminal statutes, and they don't have the expectation of privacy that good, law-abiding citizens have.

I think that this -- that the officer did have reasonable suspicion based on, as I have said, the area; who this person was; his actions; how nervous he was. He knew -- the officer then found out that the Defendant had signed this waiver and authorized a search without a warrant.

The Court finds that under all the above this was perfectly reasonable and that the motion to suppress should be denied.

Subsequently, the Defendant pled guilty to possession of cocaine, reserving a certified question of law. The trial court entered an agreed order that articulated the Defendant's certified questions of law as:

1. Did the officer exceed the scope of the stop once he discovered that the posted dealer tag was valid and the detention continued

2. Did the officer exceed the scope of the stop once a check of the paperwork and

driver's license of the defendant were discovered valid and the detention continued.

3.  If a defendant signs a mandatory blanket consent form as part of an order for probation, does that consent allow any law enforcement to search the defendant and his property; and

4.  If a defendant signs a mandatory blanket consent form as part of an order for probation, can consent be withdrawn by the defendant.

## II.  Analysis

## A.  Certified Question of Law

Because this appeal comes before us as a certified question of law, pursuant to Rule 37(b) of the Tennessee Rules of Criminal Procedure, we must first determine whether the question presented is dispositive.  Tennessee Rule of Criminal Procedure 37(b) provides, in pertinent part, that:

> An appeal lies from any order or judgment in a criminal proceeding where the law provides for such appeal, and from any judgment of conviction . . . upon a plea of guilty [if] . . . [the] defendant entered into a plea agreement under Rule 11(e) but explicitly reserved with the consent of the state and of the court the right to appeal a certified question of law that is dispositive of the case and the following requirements are met:
>
> (A) The judgment of conviction, or other document to which such judgment refers that is filed before the notice of appeal, must contain a statement of the certified question of law reserved by the defendant for appellate review;
> (B) The question of law must be stated in the judgment or document so as to identify clearly the scope and limits of the legal issue reserved;
> (C) The judgment or document must reflect that the certified question was expressly reserved with the consent of the state and the trial judge; and
> (D) The judgment or document must reflect that the defendant, the state, and the trial judge are of the opinion that the certified question is dispositive of the case . . . .

Tenn. R. Crim. P. 37(b)(2)(i) (amending the rule to include the four specific conditions set forth in subsection (b)(2)(i) above, effective July 1, 2002); see also State v. Preston, 759 S.W.2d 647, 650 (Tenn. 1988).  Because all of the evidence indicating that the Defendant was in the possession of cocaine was obtained after the stop that he is challenging, were we to conclude that the stop was unconstitutional there would be no evidence to support the Defendant's conviction.  Accordingly, we agree with the trial court and the parties that the certified question of law is dispositive in this case.  The prerequisites for the consideration of the merits of a certified question of law have been met, and, therefore, we begin our analysis of the certified questions of law that are presented.

## B. Motion to Suppress

The Defendant contends that the trial court erred when it denied his motion to suppress because: (1) the officer exceeded the scope of the stop once he discovered that the posted dealer tag was valid and the detention continued; (2) the officer exceeded the scope of the stop once a check of the paperwork and driver's license of the Defendant were discovered valid and the detention continued; (3) the mandatory blanket consent form that the Defendant signed as part of an order for probation did not give the Defendant's consent for any law enforcement officer to search him and his property; and (4) the Defendant withdrew any consent that he gave as part of the mandatory blanket consent form that was part of his probation agreement.

The standard of review for a trial court's findings of fact and conclusions of law in a suppression hearing was established in State v. Odom, 928 S.W.2d 18 (Tenn. 1996). This standard mandates that "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. at 23; see State v. Randolph, 74 S.W.3d 330, 333 (Tenn. 2002). The prevailing party in the trial court is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Furthermore, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. However, this Court reviews the trial court's application of the law to the facts de novo, without any deference to the determinations of the trial court. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). The defendant bears the burden of demonstrating that the evidence preponderates against the trial court's findings. Odom, 928 S.W.2d at 22-23; see State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, and Article I section 7 of the Tennessee Constitution, protect citizens against unreasonable searches and seizures.

> Consequently, under both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement.

State v. Simpson, 968 S.W.2d 776, 780 (Tenn. 1998). The Federal and State Constitutions' prohibitions against unreasonable searches and seizures also apply to vehicles. Id. Accordingly, we must first determine whether the detention of the Defendant by the police officer amounted to a seizure. If so, we must then determine whether the officer possessed an articulable reasonable suspicion for an investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968), and its progeny. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry, 392 U.S. at 19 n.16; State v. Hord, 106 S.W.3d 68, 70 (Tenn. Crim. App. 2002). The Supreme Court stated that "a person has

been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980); Hord, 106 S.W.3d at 71. Further, our Supreme Court has stated, "When an officer turns on his blue lights, he or she has clearly initiated a stop . . . [and the vehicle's driver is] 'seized' within the meaning of the Terry decision." State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993).

In the case under submission, it is clear that the Defendant was "seized" within the meaning of the State and Federal Constitutions. Further, the Defendant does not contend that the officers improperly stopped him, but he contends that the officers exceeded the scope of the stop and improperly executed the mandatory consent to search provision in the probation agreement. We will now turn to address whether the officers exceeded the scope of the stop.

## 1. Scope of the Stop

The Defendant contends that the officers exceeded the scope of the stop when the detention continued after: (1) the officers discovered that the posted dealer tag was valid; and (2) learning that the Defendant's driver's license and paperwork were valid. As a general rule, the stop of an automobile is constitutionally reasonable, under both the State and Federal Constitutions, if the police have probable cause or reasonable suspicion to believe that a traffic violation has occurred. State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997). Whether a traffic stop is initiated based on probable cause or reasonable suspicion, a resulting investigation is reviewed under the framework established in Terry v. Ohio, 392 U.S. 1 (1968). See United States v. Brignoni-Ponce, 422 U.S. 873 (1975). Such investigations require that an officer's actions must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. The detention "must be temporary and last no longer than necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491 (1983); State v. England, 19 S.W.3d 762, 767-68 (Tenn. 2000). Moreover, the officer should employ the least intrusive means reasonably available to investigate his or her suspicions in a short period of time. Royer, 460 U.S. at 500. "The proper inquiry is whether during the detention, the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." State v. Simpson, 968 S.W.2d 776, 783 (Tenn. 1998) (citation omitted). "If the time, manner or scope of the investigation exceeds the proper parameters," a constitutionally permissible stop may be transformed into one which violates the Fourth Amendment and Article 1, Section 7. United States v. Childs, 256 F.3d 559, 564 (7th Cir. 2001); see also State v. Morelock, 851 S.W.2d 838, 840 (Tenn. Crim. App. 1992). In the context of determining whether investigative methods run afoul of the Fourth Amendment and Article 1, Section 7, this Court has stated that requests for driver's licenses and vehicle registration documents, inquiries concerning travel plans and vehicle ownership, computer checks, and the issuance of citations are investigative methods or activities consistent with the lawful scope of any traffic stop." State v. Gonzalo Garcia, No. M2000-01760-CCA-R3-CD, 2002 WL 242358, at *21 (Tenn. Crim. App., at Nashville, Feb. 20, 2002) (citing United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000); United States v. Hill, 195 F.3d 258, 268 (6th Cir. 1999); United States v. Lyton, 161 F.3d 1168, 1170 (8th Cir. 1998)), *overruled on other grounds by* State v. Garcia, 123 S.W.3d 335 (Tenn.

2003).

In the case under submission, we hold that the questioning of the Defendant and the inquiry into his driver's license documentation did not exceed proper perimeters and create an unreasonable detention. Upon first stopping the Defendant in the highest crime area of Sumner County, Officer Starks noted that the Defendant was "extremely nervous" and that his hands were shaking. The officer asked the Defendant about his driving history and his criminal history. The Defendant told the officer that he was currently on probation for vandalism, but, after further questioning, he conceded that he was also on probation for drug offenses and that he had a previous gun charge. Further, the officer recognized the Defendant and recalled the Defendant's reputation as a drug user and dealer. The officer requested and obtained the name of the Defendant's probation officer. Officer Starks then went back to his own vehicle, and, while he checked the Defendant's driver's license and wrote the Defendant a warning ticket, his partner Officer Guthrie contacted the Defendant's probation officer and learned that the Defendant had signed a consent to search provision as part of his community corrections agreement. We conclude that given the evidence elicited during this investigation, the Defendant's demeanor, and his lack of candor about being on probation for prior drug offenses, the Defendant was not unreasonably detained. He is, therefore, not entitled to relief on this issue.

## 2. Warrantless Search

The Defendant next contends that the mandatory blanket consent form that the Defendant signed as part of an order for probation did not give the Defendant's consent for any law enforcement officer to search him and his property and that he withdrew any consent that the form conveyed.

### a. Consent Provision

This Court has previously addressed whether a similar condition of probation was unconstitutional because it infringed upon a defendant's Fourth Amendment rights. State v. Davis, 191 S.W.3d 118 (Tenn. Crim. App. 2006). The Davis Court, addressing the issue as one of first impression, quoted from a United States Supreme Court case, United States v. Knights, 534 U.S. 112, 114 (2001). In Knights, the Court stated:

> The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Wyoming v. Houghton, 526 U.S. 295, 300, 119 S. Ct. 1297, 143 L. Ed. 2d 408, 419 (1999). [The defendant's] status as a probationer subject to a search condition informs both sides of that balance. "Probation, like incarceration, is 'a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty.'" Griffin, [483 U.S. 868,] at 874 [(1987)] 107 S. Ct. 3164 (quoting G. Killinger, H. Kerper, P. Cromwell, Probation and Parole in the Criminal Justice System 14

(1976)). Probation is "one point . . . on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." 483 U.S. at 874, 107 S. Ct. [at] 3164. Inherent in the very nature of probation is that probationers "do not enjoy 'the absolute liberty to which every citizen is entitled.'" Ibid. (quoting Morrissey v. Brewer, 408 U.S. 471, 480, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972)). Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens.

. . . It was reasonable to conclude that the search condition would further the two primary goals of probation-rehabilitation and protecting society from future criminal violations. The probation order clearly expressed the search condition and [the defendant] was unambiguously informed of it. The probation condition thus significantly diminished [the defendant's] reasonable expectation of privacy.

In assessing the governmental interest side of the balance, it must be remembered that "the very assumption of the institution of probation" is that the probationer "is more likely than the ordinary citizen to violate the law." Griffin, 483 U.S. at 880, 107 S. Ct. 3164. The recidivism rate of probationers is significantly higher than the general crime rate. . . . And probationers have even more of an incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation and possible incarceration, in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply.

The State has a dual concern with a probationer. On the one hand is the hope that he will successfully complete probation and be integrated back into the community. On the other is the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community. . . . Its interest in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not the ordinary citizen.

Knights, 534 U.S. at 118-21 (footnotes and some citations omitted). The Supreme Court then held:

[T]hat the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house. The degree of individualized suspicion required of a search is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable. . . . When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal

-11-

activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.

Id. at 121. In Knights, the Court never addressed "whether warrantless searches of probationers are per se reasonable under the Fourth Amendment or whether a probationer's acceptance of the search condition constituted consent to a complete waiver of his Fourth Amendment rights under the consent standards of" Schneckloth v. Bustamonte, 412 U.S. 218 (1973). See Davis, 191 S.W.3d at 121.

In Davis, the defendant pled guilty to possession of drug charges and was placed on four years of supervised probation. Id. at 119. One of the defendant's conditions of probation was a consent to search provision similar to the one involved in the case under submission. Id. Shortly after the defendant signed this agreement, the defendant's probation officer and two other law enforcement officers attempted to search the defendant's home, and the defendant refused permission. Id. The defendant in Davis contended that the consent to search provision violated his Fourth Amendment rights. After citing to Knights, this Court held that it was "unnecessary to address the broader issue of the constitutionality of the warrantless search condition of probation" because the search was permitted based on the facts that "(1) the warrantless search provision was reasonably related as a condition of the Appellant's probation; and (2) the attempted warrantless search of the Appellant's residence was supported by reasonable suspicion."

In the case under submission, we conclude similarly to the Knights and Davis courts. When determining whether an officer had reasonable suspicion, a court must consider the totality of the circumstances, as well as the rational inferences and deductions that a trained officer may draw from the facts known by the officer. State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992).

Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is required to show probable cause.

State v. Pully, 863 S.W.2d 29, 32 (Tenn. 1993) (citing Alabama v. White, 496 U.S. 325, 330 (1990)). When looking to the totality of the circumstances in the case presently before us, we conclude that the officer had a reasonable suspicion to conduct the search. As previously stated, the Defendant was driving in the highest crime area in Sumner County, he appeared "extremely nervous" when the officer spoke to him, and he was a known drug dealer and user who was on probation for drug offenses at the time of the stop. We therefore hold that the warrantless search of the Defendant, supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment.

Now we turn to address the Defendant's contention that the consent to search provision is not constitutional with regard to the law enforcement officers in this case because they were not

accompanied by the probation officer. Again, the consent to search provision explained to and signed by the Defendant states, in pertinent part, "My probation officer and/or any law enforcement officer has my consent to search my . . . automobile . . . or my person at any time without the necessity of a search warrant." This clearly contemplates that the probation officer need not be present when the search is conducted. Further, the Knight case discussed previously at length involved a situation in which a detective conducted a warrantless search of a probationer's home. There is no indication in that case that the probation officer was present, and we see no reason why that distinction would affect that, or our, holding. Therefore, the Defendant is not entitled to relief on this issue.

### b. Withdrawal of Consent

The Defendant next contends that he withdrew any consent that the provision signed by him conveyed. We conclude that we need not address the issue of whether consent under these circumstances can be withdrawn because the record shows that the Defendant did not adequately withdraw his consent. First, the Defendant clearly signed the consent to search provision acknowledging the conditions of community corrections and accepting those conditions in exchange for not having to serve his sentence incarcerated in prison. Further, as previously articulated, Officer Starks twice asked the Defendant for consent to search his truck, and the Defendant twice said that he did not understand why a search was necessary during a traffic stop. The officer then learned that the Defendant had signed a consent to search provision, and he conducted the search based upon that provision. There is nothing in the record to indicate that the Defendant ever revoked the consent to search provision in his community corrections agreement. Accordingly, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing authorities and reasoning, we affirm the trial court's judgment.

_____

ROBERT W. WEDEMEYER, JUDGE